William E. BROCK, Secretary of Labor, Petitioner,

v.

MORELLO BROTHERS CONSTRUCTION, INC., et al., Respondents.

No. 86–1442.

United States Court of Appeals, First Circuit.

Argued Nov. 3, 1986.

Decided Jan. 20, 1987.

John Shortall with whom George R. Salem, Deputy Sol. of Labor, John J. Hynan, Acting Associate Sol. for Occupational Safety and Health, Joseph M. Woodward, and Sandra Lord, Asst. Counsel, for Appellate Litigation, Washington, D.C., were on brief, for petitioner.

Richard A. Perras with whom M. Meredith Hayes and Edwards & Angell, Boston, Mass., were on brief, for respondent Morello Bros. Const., Inc.

Before CAMPBELL, Chief Judge, TIMBERS,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

An Administrative Law Judge for the Occupational Safety and Health Review Commission found that Morello Brothers committed several "serious violation[s]" of OSHA safety regulations, 29 U.S.C. § 666(b), but that Morello did not "willfully ... violate" these rules. 29 U.S.C. § 666(a). The Secretary of Labor seeks review of the latter finding. He argues that the evidence was strong enough to compel a conclusion of "willful" misbehavior as a matter of law. Morello Brothers replies that the record provides adequate support for the ALJ's finding. After reviewing that record, including relevant portions of the hearing transcript, with care, we conclude that Morello is correct. Thus, we affirm OSHRC's decision.

The OSHA regulations at issue, 29 C.F.R. §§ 1926.500(g)(1) and 1926.500(g)(5), concern work on roofs. They say that when workers are performing certain work on a flat (or gently sloped) roof at least 16 feet above the ground, their employer must take either of two sets of special precautions. First, the employer may either require all workers to wear safety lines or erect a guardrail or safety nets around the roof. (Each of these three safety measures is called a "motion-stopping-safety system" or "MSS." 29 C.F.R. § 1926.502(p)(5)). Alternatively, the employer may

string a warning line (a waist-high rope, wire or chain) around the roof perimeter at least six feet (sometimes more) in from the edge. Presumably, when workers bump into the line they will know that they are near the edge. Employers who use a warning line must also provide an MSS to protect workers outside the warning line. There is, however, an exception to the MSS requirement; workers may work outside the warning line (or anywhere on relatively narrow roofs) if a "safety monitor" is watching them. This exception, we are told, reflects the fact that roofing workers do not want to wear safety lines because they drag in the hot tar. In any event, the exception does not apply in two circumstances: 1) if the workers are using mechanical equipment, or 2) in a "materials handling area" or a "materials storage area" near the roof edge (29 C.F.R. § 1926.500(g)(5)). In either of the latter cases, workers must use an MSS (guardrails or safety nets or safety lines).

We assume that in many roof work cases, guardrails and nets are impractical; the question is one of safety lines. In such a case, the rules basically say (1) you must use safety lines in a roof edge area unless you have a safety monitor; but (2) even then you must use safety lines (a) if there is mechanical equipment or (b) if you are in a roof edge "materials" area.

These rules are complex but reasonably clear. We have set out in the Appendix the regulations that enunciate them. Still, they are not perfectly clear. We are not certain, for example, whether the presence of any machine anywhere on a roof (say, a crane in the middle of a big roof) means that workers at the edge *must* use an MSS (as opposed to a safety monitor), or whether it is the machine's presence in the six-foot "roof edge" area that triggers the "MSS only" requirement. Regardless, the rules say that workers in that "roof edge" area must either use an MSS or have a "safety monitor," and that (unless one of these precautions is applied everywhere on

* Of the Second Circuit, sitting by designation.

the roof) there must be a warning line around the "edge area" perimeter.

The violations here at issue arose in the following circumstances. Morello Brothers is an established roofing company that has done considerable work for the federal government in New England. In the fourteen years prior to June 1984, OSHA had cited it twice, for rather minor violations. In June 1984, Morello began work in Concord, New Hampshire, on the roofs of several federal buildings, including a building that housed OSHA's office. On June 28, Morello employees were at work removing roof material from the flat roof of a GSA garage—a roof that was about twenty feet above the ground (and surrounded by a low perimeter ridge). An OSHA employee, looking out his window, noticed that Morello's workers were using machinery, that they were working near the edge of the roof, and that they were not protected by safety lines, guardrails or safety nets. OSHA employees then went to the roof, where they found other violations, including a warning line strung along only part of one side of the roof rather than around the entire roof edge. OSHA issued citations for violations of the Act.

After June 28, Morello worked on other government buildings, including the building in which OSHA had its office, without incident. But, on July 11, OSHA employees noticed that Morello was again violating OSHA rules. Its workers were now on the roof of the post office building (or Federal Building)—a flat roof, surrounded by a low wall or parapet about 12 inches high, 60 to 70 feet above the ground, and with a smaller "penthouse" in the area at its center. The workers were dismantling roof material. They would place the material in a small mechanical buggy which they would drive across the roof to a large bucket, where they would deposit it. Periodically, when the bucket was full, a crane would lift it off the roof and set it on the ground. OSHA inspectors found that the workers were too close to the edge, working without guardrails, safety nets or safety lines. They also found that the workers had not strung a warning line around the roof, six feet from its outer edge. Following the inspection, the site foreman refused to discuss the violations with inspectors; an inspector then called Mr. Morello, the owner of the company, who promised to remedy matters.

By the next day, July 12, Morello had taken definite steps to improve the situation. It had removed the gas-driven buggies from the roof, substituting hand-pushed wheelbarrows. It also appointed a safety monitor. Morello did continue to use some mechanical equipment on the roof, specifically, electrical cutters for removing the roofing material (these cutters were on the roof on July 11, but apparently were not used on that day). Morello did not use the mechanical cutters to break up the roofing material near the roof edge; instead, it did so by hand (with axes and shovels), even though doing so meant harder physical labor and more time and expense. Still, OSHA inspectors, who observed the site on July 12 and returned to the roof on July 13, felt that Morello was not in compliance on either date; some machines remained on the roof, and workers were still handling some materials near the roof edge. These facts, under OSHA's rules, meant that a "safety monitor" was not sufficient; safety lines or guardrails or nets were required. OSHA therefore issued citations for all three days.

OSHRC's ALJ upheld all these citations as valid. Nonetheless, he found that Morello had not "willfully" violated the rules. OSHRC itself declined to review the finding, *see* 29 U.S.C. § 661(j), and the Secretary of Labor now asks us to do so.

The only question before us is whether there is "substantial evidence on the record considered as a whole," 29 U.S.C. § 660(a); *see also* 5 U.S.C. § 706(2)(E), supporting the ALJ's conclusion that Morello's violations were not willful. The legal meaning of the word "willful" is not at issue. Although the meaning of this word varies in different statutory contexts, courts have consistently held that it refers to a state of mind that differs from "intentional" in that

it implies some form of awareness, not simply of the forbidden conduct, but also of the statute or rule that forbids it. In the criminal law, "willful" conduct typically means that the offender not only intended to perform the unlawful act, but also that he knew that what he did was unlawful. *See, e.g., United States v. Murdock*, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933) (defendant did not "willfully" fail to supply information to tax authorities where he reasonably believed he had a constitutional right not to do so). In civil cases such as this one, the standard is weaker in that an act may be "willful" if the offender shows "indifference" to the rules; he need not be consciously aware that the conduct is forbidden at the time he performs it, but his state of mind must be such that, if he were informed of the rule, he would not care. *See Trans World Airlines v. Thurston*, 469 U.S. 111, 125–30, 105 S.Ct. 613, 623–26, 83 L.Ed.2d 523 (1985) (violation of Age Discrimination in Employment Act not "willful" unless employer acts in "reckless disregard" of the Act); *United States v. Illinois Central R.R. Co.*, 303 U.S. 239, 243, 58 S.Ct. 533, 535, 82 L.Ed. 773 (1938) (term encompasses actor who "either intentionally disregards the statute or is plainly indifferent to its requirements") (*quoting St. Louis & S.F.R.R. Co. v. United States*, 169 F. 69, 71 (8th Cir.1909)). That at least such indifference is required in OSHA cases is indicated not only by the case law, *see Donovan v. Mica Construction Co.*, 699 F.2d 431 (8th Cir.1983) (violation not willful where employer reasonably believed rule did not cover its project); *St. Joe Minerals Corp. v. OSHRC*, 647 F.2d 840, 845–49 (8th Cir.1981) (violation of general duty clause not willful where condition not so clearly unsafe as to establish "indifference"); *Babcock & Wilcox Co. v. OSHRC*, 622 F.2d 1160, 1165–68 (3rd Cir.1980) (similar), but also by the statutory distinction between "serious" and "willful" violations. The statute defines as "serious" any violation which poses a substantial danger of death or serious physical harm "unless the employer did not, and could not with the exercise of reasonable diligence, know of

the presence of the violation." 29 U.S.C. § 666(k). If a "willful" violation did not additionally require at least indifference to the law, it would be indistinguishable from a "serious" infraction.

Of course, there may be instances in which unsafe conduct is so egregious, so life-threatening, that the agency might apply an "objective" standard of willfulness, assuming its existence from the offender's knowledge of conditions even without direct evidence of its subjective attitude toward the law. *See Central Soya de Puerto Rico v. Secretary of Labor*, 653 F.2d 38 (1st Cir.1981) (heavily corroded flooring over fourteen-foot drop); *Ensign-Bickford Co. v. OSHRC*, 717 F.2d 1419, 1421–23 (D.C.Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984) (failure to train or supervise employees working with volatile explosives). But, this is not such a case. For experienced workers on a flat roof (surrounded by a low parapet) to come within a foot or two of the edge under the eye of a monitor may be unsafe, but it is not so *obviously* unsafe that the agency is required by law to assume a "willful" state of mind on the part of the employer. It is still less obvious that working near the edge with axes, shovels and wheelbarrows is safer (in respect to falls) than working there with electric cutters and mechanical trash hauling carts.

All this is to say that there cannot be a legal presumption of "willfulness" in this case. Moreover, the ALJ stated the legal standard in a manner perfectly consistent with case law:

> Various decisions have defined "willful" violations as "conscious and intentional disregard of conditions;" "deliberate and intentional misconduct;" "careless disregard of employee safety;" "utter disregard of consequences;" and similar descriptions. They all indicate that the Complainant should at least prove that the Respondent knew of the standard, and its violation was voluntary or intentional or with plain indifference to the Act.

See *F.X. Messina Construction Corp. v. OSHRC*, 505 F.2d 701, 702 (1st Cir.1974) ("indifference to the requirements of law;" "conscious, intentional, deliberate, voluntary decision"); *A. Schonbek & Co. v. Donovan*, 646 F.2d 799, 800 (2d Cir.1981) ("intentional disregard of, or plain indifference to, the statute"); *see generally* M. Rothstein, *Occupational Safety and Health Law* § 315 (2d ed. 1983). Thus, all that remains for us to do is, as we said, to decide whether the evidence in the record supports the ALJ's finding that the conduct was not willful. Since, as the ALJ explicitly noted, the Secretary bore the burden of proof, 5 U.S.C. § 556(d), 29 C.F.R. § 2200.-73(a), the precise question is whether the evidence supports his finding that the Secretary *failed to prove* that Morello's conduct was willful.

Given the subjective nature of the fact involved (state of mind), the greater opportunity of hearing officers to observe witnesses and thereby to assess likely employer attitudes toward the law, and the fact that the Secretary bears the burden of proof, it does not surprise us that we have found only one case in which a court of appeals *required* the agency to find willfulness when the fact-finder itself had found the contrary. *Donovan v. Capital City Excavating Co.*, 712 F.2d 1008 (6th Cir. 1983). Such a ruling is possible only in an egregious instance in which the agency simply refuses to find willfulness even though the record requires it. This case is not such an instance.

To be sure, sufficient evidence was introduced to support an ALJ finding of willfulness. For example, the July 11 violations were very similar to those for which Morello had been cited on June 28. OSHA officials testified that they had explained the rules to Morello officials both on June 28 and 29 and on July 11, and that Mr. Morello had promised, on July 11, to remove mechanical equipment from the roof and to use safety lines; that Morello still had not cured all the violations on July 12 and 13; and that Morello officials told OSHA inspectors that the rules were "ridiculous" and threatened to come to work so early in the morning that the officials would not see what they were doing (and, the workers in fact did start work at 5 a.m. on July 12 and 13).

On the other hand, there was also sufficient evidentiary support for the ALJ's contrary conclusion—that the Secretary failed to prove that the violations were willful. The July 11 violations were not precisely like those of June 28. Morello officials testified that the OSHA representative had told them on June 28 basically that they must move materials and men back six feet from the edge. The foreman said that his supervisor "told me to stay at least within six feet of the roof edge" and that he had tried to comply; he had moved his dumping area in from the edge; he had moved materials in from the edge. Of course, doing so did not by itself satisfy the regulations as long as workmen *in fact* worked closer to the edge (without a safety monitor or MSS), nor did it cure the violations arising out of use of machinery; but the ALJ might have thought that Morello's foreman was making a good faith effort to comply with what he thought was basically required. The testimony of John Colantonio, a Morello supervisor, suggests that the OSHA officials had emphasized the need to move materials and equipment in from the edge; that is what Colantonio evidently emphasized to his subordinates; and he added that he thought at the time that he and OSHA had everything "ironed out." Although OSHA officials gave Colantonio a copy of OSHA's regulations on June 28, those regulations are not written so very clearly that we can say that the Morello officials *must* have known all the details. Indeed, an OSHA official himself testified that he (later) told a Morello worker "that people can't be working on the edge of the roof *while the mechanical equipment is being used*" (emphasis ours)—a fact suggesting that the OSHA officials might have emphasized the use of equipment and placement of materials, rather than the details of the requirements, throughout their conversations with Morello.

In its post-hearing brief to the ALJ, OSHA emphasized the July 11 failure to provide "even ... a token warning line" as showing willfulness. But, the foreman testified that there had been warning lines strung around the perimeter of the penthouse roof on that day; he added that the workmen had then begun to work on the main roof surrounding the penthouse; the ALJ thus might have thought that the failure to move the lines was more careless than deliberate. The ALJ further took account of the fact that Morello had been in business for 14 years with only two previous citations for minor violations of the rules, and that Morello worked frequently for the federal government—facts suggesting that Morello would not intentionally engage in what it knew to be significant violations of OSHA regulations.

Finally, the ALJ relied in part upon the fact that Morello made considerable efforts on July 12 and 13 to improve the situation. The Secretary argues that it was legally improper for the ALJ to take account of this "post-violation" conduct. But, the Secretary is wrong. The way in which a firm responds to a subsequent violation *is* relevant to the question of whether its response to a prior violation was in good faith; it might not prove much, but it shows at least a little about how people in the firm respond to the receipt of a citation. The cases on which the Secretary relies are not on point. In *Donovan v. Capital City Excavating Co., supra,* the evidence was uncontradicted that the employer had deliberately ordered its employees to work under conditions which it knew to violate an OSHA regulation; the court held that, *under these circumstances,* the employer's intent to comply in the future and its later cessation of activity when it became convinced that conditions were actually unsafe could not, as a matter of law, establish that the violation was not willful. *Donovan v. Williams Enterprises,* the other case cited by the Secretary, is if anything even less helpful, for there OSHRC found that the violation *was* willful; the court held only that the post-violation conduct did not *require* a "not willful" finding. 744 F.2d 170, 180 (D.C.Cir.1984). Neither case suggests that post-violation conduct can never carry *any* weight in the ALJ's determination.

Weighing the evidence, viewing it with a skeptical or friendly eye, is up to the ALJ, in light of his observation of the witnesses. He decided that the Secretary did not prove the violation to have been willful on July 11, and we cannot say he was wrong.

The ALJ's decisions about July 12 and 13 have still more record support. By that time, Morello had made substantial compliance efforts, appointing a safety monitor and substituting wheelbarrows and pickaxes for mechanical equipment. Doing so slowed the work and imposed considerable added cost. Although some mechanical equipment was still being used and some material remained within six feet of the edge, so that, under the rules, a safety monitor alone was inadequate to permit work near the edge, the ALJ might have thought that these incidents were isolated and not "willful." The Secretary below made much of a heated argument between Colantonio and an OSHA official, and particularly of the fact that Colantonio threatened to begin work at 5 a.m. and then did so. Morello's foreman testified, however, that the early working hour was necessary in light of the midday heat and the hot tar and the need not to disturb court proceedings in the building. We do not know whether the early hour reflected an effort to thwart OSHA or whether, instead, Colantonio's comment (given his knowledge that work would start early anyhow) was merely gratuitous. ALJs were created to decide this type of question, and the legal right to decide them rests with the agency. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

In sum, this case presents one fact-based legal question; and we find that the record offers legally adequate evidentiary support for the ALJ's result. Thus, the agency's decision is legally correct.

The petition for review is *denied.*

APPENDIX

29 C.F.R. § 1926.500(g)(1)

(g) Guarding of low-pitched roof perimeters during the performance of built-up roofing work—(1) General provisions. During the performance of built-up roofing work on low-pitched roofs with a ground to eave height greater than 16 feet (4.9 meters), employees engaged in such work shall be protected from falling from all unprotected sides and edges of the roof as follows:

(i) By the use of a motion-stopping-safety system (MSS system); or

(ii) By the use of a warning line system erected and maintained as provided in paragraph (g)(3) of this section and supplemented for employees working between the warning line and the roof edge by the use of either an MSS system or, where mechanical equipment is not being used or stored, by the use of a safety monitoring system; or

(iii) By the use of a safety monitoring system on roofs fifty feet (15.25 meters) or less in width (see Appendix A), where mechanical equipment is not being used or stored.

\*    \*    \*

§ 1926.500(g)(5)

(5) Roof edge materials handling areas and materials storage. Employees working in a roof edge materials handling or materials storage area located on a low-pitched roof with a ground to eave height greater than 16 feet (4.9 meters) shall be protected from falling by the use of an MSS system along all unprotected roof sides and edges of the area.