# United States Court of Appeals

## For the First Circuit

No. 03-2373

CAPEWAY ROOFING SYSTEMS, INC.,

Petitioner,

v.

ELAINE CHAO, SECRETARY OF LABOR,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF

THE OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

Before

Boudin, Chief Judge,

Selya and Howard, Circuit Judges.

Richard D. Wayne with whom Brian E. Lewis and Hinckley, Allen & Snyder LLP were on brief for petitioner.
Ronald J. Gottlieb, United States Department of Labor, Office of Solicitor, with whom Howard M. Radzely, Solicitor of Labor, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, and Ann Rosenthal, Counsel for Appellate Litigation, were on brief for respondent.

December 10, 2004

**BOUDIN**, **Chief Judge**.  Capeway Roofing Systems, Inc. ("Capeway"), a roofing contractor in Massachusetts, was fined by the Occupational Safety and Health Review Commission ("the Commission") for safety violations.  It now seeks review in this court.  29 U.S.C. § 660(a) (2000).  The story is quickly told, reserving details for the discussion of individual claims of error.

On April 24, 2000, two inspectors charged with enforcing the Occupational Safety and Health Act ("the Act") visited a site in Weymouth, Massachusetts, where Capeway was constructing roofing on a new firehouse.  The firehouse had four roofs: one, high and steeply pitched, over the center of the garage; two wider and somewhat flatter roofs extending over the rest of the garage; and a lower flat roof over the living quarters attached to the garage.[1]

The inspectors, Peter Barletta and James Holiday, according to their testimony, found that employees were working or walking on all four roofs without hardhats and without physical "fall protection" measures such as warning lines near roof edges. The inspectors interviewed Capeway supervisor Dennis Mello and the job foreman, Manny Araujo, who said they were acting as safety monitors; but (according to Barletta) Mello admitted that he used his own criteria rather than the Occupational Safety and Health

---

[1]The highest roof had a pitch of "6 in 12," a vertical rise of 6 inches for every foot of horizontal run; the intermediate roofs' pitch was one half-inch per foot.

Administration's ("OSHA") requirements for deciding whether to use fall protection gear for the men.

The inspection turned up various other problems--improper scaffolding, lack of training, materials stacked close to the roof edge, and rusty safety equipment. In due course, the agency charged Capeway with nine violations; after an evidentiary hearing, the administrative law judge ("the ALJ") imposed a fine of $117,000, which the Commission upheld on review. In this court, Capeway contests seven of the nine violations, the penalties assessed, and the ALJ's handling of witness sequestration.

On judicial review, the Commission's orders are to be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (2000). Fact findings are sustained if supported by substantial evidence. 29 U.S.C. § 660(a). We begin with a central claim of procedural error and then take up the specific citations in dispute one by one.

Sequestration of witnesses. Capeway opens by claiming that in his sequestration rulings the ALJ violated Rule 615 of the Federal Rules of Evidence, made applicable by 29 C.F.R. § 2200.71 (2004). In essence, Rule 615 requires that, upon a party's request, the presiding official exclude witnesses from the room "so that they cannot hear the testimony of other witnesses" (and so tailor their own testimony). There is an exception for an officer

or employee designated to represent a party that is "not a natural person." Fed. R. Evid. 615.

At the hearing in this case, Barletta and Holiday testified to the violations, and the OSHA area director, Brenda Gordon, testified about the penalties. Barletta went first and, about halfway through his testimony, agency counsel asked for sequestration of witnesses. Capeway's lawyer objected but the ALJ ordered sequestration, adding that "the compliance officer can stay"--an apparent reference to Holiday--and that any other witnesses had to leave except that "[c]lients can stay here."

When Capeway's lawyer asked that other witnesses for the agency also be sequestered, agency counsel said that Gordon would be the only witness for the agency beside the inspectors, and that she would be testifying about the penalties. The ALJ said that she could also stay, and Capeway counsel objected. Gordon and Holiday both stayed in the hearing as did Araujo, who did not testify. The company's only witness was Barry Metzler, Capeway's safety consultant, and it appears that he was sequestered.

In a footnote in its post-hearing memorandum, Capeway said as to the sequestration issue only that Holiday had tailored his testimony "to address the weaknesses" in Barletta's testimony. In his decision, the ALJ replied (also in a footnote) that he refused to strike Holiday's testimony because both Holiday and Gordon could stay under Rule 615 and because Capeway failed "to

identify even one instance" where Holiday's testimony was "suspect." On review, the two-member Commission panel found any error as to sequestration to be "harmless."

In this court, Capeway devotes to this issue ten pages of its brief enriched by the usual rhetoric ("fundamental right to a fair trial," "right to due process"). The agency denies that there was any error at all, says that the issue was not properly preserved, and finally says that any error would have been harmless. We think that there probably was an error, although not one of major proportions; that the waiver issue is muddled; and that the error was patently harmless and does not deserve the fuss being made about it.

Whether the agency designated Gordon or Holiday as its representative (it is not clear that the agency formally designated anyone), the bare language of Rule 615 suggests that only one of them should have stayed. Conceivably the agency could argue that Holiday was its representative and that Gordon, although also a witness, was testifying to an unrelated matter; there is a hint that the ALJ may have so viewed the situation. But we will assume arguendo, in the company's favor, that Holiday should have left.

Nevertheless, there is no indication whatever that Capeway was improperly prejudiced. The sequestration rule is concerned primarily with falsification: for example, that the second witness might testify to things he did not see but instead

-5-

learned from the testimony of the first witness, or that he might alter his testimony to conform to that of the first, thereby strengthening it instead of undercutting it.  See Fed. R. Evid. 615 & 1972 advisory committee note.

Capeway makes no effort whatever to show that this occurred.  Instead, it argues, with examples, that Holiday "tailored" his testimony by addressing points helpful to the charges against Capeway that Barletta had left out of his testimony.  But in the ordinary case this is not improper prejudice: even if Holiday had been excluded, agency counsel would have been free to ask Holiday questions thereafter to cover any matters that Barletta had scanted or ignored.

It is often hard to prove actual prejudice where there has been a failure to sequester; and without delving into problems of burden of proof and the like, see 29 Wright & Gold, Federal Practice and Procedure § 6244 (1997), we would be open to a suggestion of prejudice where there was serious reason to believe that it had occurred.  In this instance, there is nothing to suggest that Holiday lied and very little new that he added to the agency's case.

This brings us to the violations found by the Commission. Under the Act, the Secretary of Labor is required to adopt workplace safety standards, 29 U.S.C. § 655 (2000); those relating to "fall protection" at construction worksites occupy over 30 pages

of the Code of Federal Regulations.  29 C.F.R. pt. 1926, subpt. M (2004).  The Act provides for civil penalties of up to $70,000 per offense for "willful" or "repeat" violations; for other violations, the cap is $7,000, and some penalty is required if the violation is "serious."  29 U.S.C. § 666 (2000).

Lack of fall protection on the central pitched roof.  The agency imposed a fine of $63,000 on Capeway for willfully failing to use physical safety devices for employees working on the highest of the four roofs.  The regulation invoked by the Commission requires such safety devices (harnesses, guardrails, or nets) for work on "steep" roofs six feet or more above "lower levels", 29 C.F.R. § 1926.501(b)(11) (2004); "steep" is defined as a roof with a pitch greater than 4 in 12, and "lower level" is defined as any surface onto which an employee can fall.  29 C.F.R. § 1926.500(b) (2004).  Along at least one edge, the roof in this case (with a pitch of 6 in 12) was over 20 feet above the ground.

Capeway says that its use of safety monitors in lieu of physical safety devices was permitted by a 1999 OSHA directive, which apparently allows such an alternative for some "residential construction."  Although the relevant regulation does not define "residential construction," 29 C.F.R. § 1926.501(b)(13), the Commission ruled that under the directive the firehouse did not qualify because (as is undisputed) the building's frame was made of steel and concrete.  By contrast, the directive says that

> Residential construction is characterized by:

> Materials: Wood framing (not steel or concrete); wooden floor joists and roof structures.

> Methods: Traditional wood frame construction techniques.

OSHA Instruction STD 3-0.1A (June 18, 1999).

The special treatment for "residential construction" appears to rest on the agency's view that a wood-based structure may be a less sturdy platform for physical restraint systems like guardrails and harnesses.  Cf. 64 Fed. Reg. 38078, 38079, 38081-82 (July 14, 1999); 58 Fed. Reg. 16515, 16516-17 (March 29, 1993). Given this rationale, argued by the agency, and the directive's language expressly connecting "residential construction" to wood-framed buildings, the Commission's decision is clearly sound--quite apart from the deference due to the agency in reading its own directive.

Capeway says that the workers were installing plywood, tar-paper, and shingles on the top roof, which is a common finishing for residential buildings, and that another contractor had done the building itself.  This is irrelevant.  The language just quoted ties "residential construction" status to the underlying structural elements of the building.  Given the asserted rationale, this makes perfect sense.  Whoever built the underlying

structure, Capeway was exposing its own workers to a forbidden risk. The agency cases Capeway cites do not salvage its position.[2]

As for the willfulness finding, the term is not defined but we have equated it with awareness that the conduct violates the regulation or, alternatively, reckless disregard for the rules. See Brock v. Morello Bros. Constr. Inc., 809 F.2d 161, 163-65 (1st Cir. 1987). In this case, Mello admitted to Barletta at the site that he used his own judgment about whether the roof was steep enough to warrant greater precautions instead of the pitch standard in the regulations; and the company had been previously cited for violating the same regulation. This is enough "substantial evidence" to support the finding.

Capeway is mistaken in saying that a chance remark by the Commission--that Capeway should have known that the residential standard did not apply--shows that the Commission used a negligence rather than a reckless disregard standard. It is also of no moment that Capeway's safety consultant Barry Metzler said that he believed that the residential standard applied; it plainly did not.

---

[2]All three cases, Sec'y of Labor v. Latite Roofing & Sheet Metal Co., Inc., 19 O.S.H. Cas. (BNA) 1287 (2000); Sec'y of Labor v. Commercial Wall, Inc., 18 O.S.H. Cas. (BNA) 1380 (1998); Sec'y of Labor v. Mlodzinski, 18 O.S.H. Cas. (BNA) 1954 (1999), deal with an older version of the directive that does not describe the structural characteristics of "residential construction" and is therefore irrelevant. See OSHA Instruction STD 3-0.1A (June 18, 1999) (expressly cancelling prior version of directive).

In all events, the willfulness finding rested solidly on the admissions made at the site and on Capeway's history of violations.

Hardhats. The Commission fined Capeway $2,800 for allowing workers to operate without hardhats when exposed to overhead hazards. 29 C.F.R. § 1926.100(a) (2004). The company says that photographs taken by the inspectors show that some workers were wearing hardhats; but they also show that other workers were not. Capeway says that those without hardhats may have been working for other employers, but Barletta testified that most of the workers on the roof, where Capeway alone was working, had only put on their hardhats after the inspection conference began.

As for exposure to overhead hazards, Capeway says that there were no overhead hazards for workers already on the roofs. Putting aside Barletta's view that the whole site was a hardhat area, anyone climbing the ladders to the roofs was exposed to falling objects (materials were in fact stored too close to roof edges); the agency was arguably entitled to infer that those on the roof not wearing hardhats when Barletta arrived had not worn them on the climb; and one man was so photographed on his ascent.

Safety monitors. A $4,000 fine was imposed for failure to use proper safety monitoring, whereby certain workers are designated to see that others do not stray too close to the edge. 29 C.F.R. § 1926.502(h) (2004). Other weaknesses in monitoring

aside, the Commission supportably found that at times Araujo was the only monitor and was not (as required) on the same roofing surface as the workers he was monitoring, and that even two monitors could not adequately have watched work activities on all four roofs. There is nothing to this claim of error.

Flat roof fall protection. The agency imposed a $28,000 fine for a "repeat" violation, meaning that a prior citation had been issued for the same offense, because inter alia there was no physical fall protection on the lowest roof--exposing workers to a 13-foot fall to the ground. 29 C.F.R. § 1926.501(b)(10) (2004). Capeway had been cited three times in the prior three years for violating the same regulation. Araujo admitted that on the workday before the inspection, some work had been done on the lower roof without such protection.

Capeway says in this court that Araujo's admission was made only to Holiday and that Mello had told the inspectors that the work on the lower roof had been completed two weeks before. The Commission was entitled to credit Araujo's statement over Mello's even if it were made only to Holiday (we have already rejected the "gap-filling" attack); but as it happens the admission was also made to Barletta (which the Commission overlooked).

Materials storage. In another "repeat" violation, the Commission fined Capeway $8,000 for storing materials within six feet of the edge of the lower flat roof despite the lack of

guardrails. 29 C.F.R. § 1926.502(j)(7)(i). Capeway says that no roofing work was being done on the lower roof (the regulation applied to storage "[d]uring the performance of roofing work") and that the materials were not being "stored" but were there only temporarily, awaiting the arrival of transportation.

Roofing work was being performed on the site, even if it was not occurring on the lower roof level. Certainly materials stored too close to a roof edge could be toppled in various ways and fall on workers below, whether or not roofing was being conducted on the same level. We need not reach the agency's further argument that its own regulations define "roofing work" to include "storage," 29 C.F.R. § 1926.500(b), or the counter-argument that this interpolation would effectively render the "[d]uring the performance of roofing work" language a nullity.

As for the alleged "temporary" character of the storage, the regulation cannot reasonably apply to materials in the process of being moved over the side, but the Commission adopted no such foolish reading. Rather, there is no evidence that such transportation was in progress, even if Mello is credited in his claim that the company planned to move the material sometime later "that morning" when the moving equipment became available.

Lack of training. In a third "repeat" violation, Capeway suffered a $6,000 fine for failing to train one of its employees-- David Hinchcliff--in fall protection. 29 C.F.R. § 1926.503(a)(1)

-12-

(2004). Apart from its "repeat" status, the violation would not have warranted so severe an award. The company did present evidence of a training program, but the agency also showed that Hinchcliff had not been properly trained.

Hinchcliff's statements to Barletta are perhaps compatible with his having received some training; but in substance he took Mello's view that certain precautions should be taken only if the roof seemed too steep--hardly reflecting what the regulation means by "adequate" training. On appeal, the company also claims that Hinchcliff's out-of-court statement was hearsay, not binding on the company; it may have been so, but the objection was not made--nor the hearsay argument urged before the Commission--and is so waived. 29 U.S.C. § 660(a). If the objection had been made, the agency could have called Hinchcliff.

Defective equipment. Finally, the company says that the Commission erred in upholding a citation (involving no financial penalty) for its use of defective safety equipment. The photos show that harness clips were extremely rusty and Holiday testified that, when opened, one of the clips did not spring back to its locked position. Capeway says that it cannot be criticized for using the harness since the inspectors said that it was better than nothing; but the citation, amply supported, is for failing to remove defective equipment from service. 29 C.F.R. § 502(d)(21) (2004).

Capeway's detailed and inventive 56-page opening brief is an exercise in hopeless ingenuity.  If the company had devoted the same effort and skill in following OSHA's safety regulations, everyone would have gained.

Affirmed.