# United States Court of Appeals
## For the First Circuit

No. 17-1537

A.C. CASTLE CONSTRUCTION CO., INC.

Petitioner,

v.

R. ALEXANDER ACOSTA, Secretary of Labor;
U.S. DEPARTMENT OF LABOR,

Respondents.

PETITION FOR REVIEW OF AN ORDER OF
THE OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

James F. Laboe, with whom Orr & Reno, P.A. was on brief, for petitioner.

Amy S. Tryon, Senior Attorney, U.S. Department of Labor, with whom Nicholas C. Geale, Acting Solicitor of Labor, Ann S. Rosenthal, Associate Solicitor for Occupational Safety and Health, and Charles F. James, Counsel for Appellate Litigation, were on brief, for respondents.

February 7, 2018

**KAYATTA**, **Circuit Judge**. General contractor A.C. Castle Construction Co., Inc. appeals fines imposed by the Occupational Safety and Health Administration ("OSHA") for violations related to an accident at a construction worksite in Massachusetts. A.C. Castle argues, among other things, that OSHA wrongly held it responsible for the acts and omissions of a subcontractor. For the reasons below, we affirm.

## I.

Two roofers fell over twenty feet and sustained serious injuries at a residential construction site in Wenham, Massachusetts on October 2, 2014, when a spruce board used for scaffolding snapped in half. OSHA inspectors promptly investigated the worksite and the two employers involved: A.C. Castle, the general contractor, and Provencher Home Improvements ("PHI"), the sole proprietorship of Daryl Provencher and the only subcontractor on the job. The Secretary of Labor, charged with enforcing the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (the "OSH Act"), subsequently cited both A.C. Castle and PHI under the OSH Act. The Secretary proffered two alternative theories for citing both companies, rather than just the roofing subcontractor PHI: first, that under Occupational Safety and Health Review Commission ("Commission") precedent, the two companies constituted a single employer; and, second, that under the common law agency test set forth by the

United States Supreme Court in Darden, Daryl Provencher was a supervisory employee of A.C. Castle. See Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992). Under either legal test, the constructive or actual knowledge that Provencher possessed of the worksite violations would be imputed to A.C. Castle. See Empire Roofing Co. Se., 25 BNA OSHC 2221, 2222 (No. 13-1034, 2016); Cent. Soya de P.R., Inc. v. Sec'y of Labor, 653 F.2d 38, 40 (1st Cir. 1981).

A.C. Castle and Provencher challenged the citations. Following a three-day testimonial hearing, the Administrative Law Judge ("ALJ") determined that Provencher and A.C. Castle "acted as a single employer in the worksite" and that Provencher "was a supervisory employee working for A.C. Castle." In so ruling, the ALJ did not rest on her finding that Provencher was an employee of A.C. Castle as an independent and sufficient basis upon which to justify the citation of A.C. Castle. Instead, she relied on that finding to provide support for the conclusion that A.C. Castle and PHI could be treated as a single employer. The ALJ also rejected A.C. Castle's argument that it did not have fair notice that it would be treated as a single employer with PHI. Regarding the substance of the citations, the ALJ found that A.C. Castle willfully failed to ensure that the scaffolding was adequate to support the intended load, and assessed penalties totaling $173,500. The claims against Provencher were dismissed as moot

because of his death after the hearing but before the ALJ ruled. After the Commission declined A.C. Castle's petition for review, A.C. Castle filed this appeal.

## II.

The citations of A.C. Castle hinged on a finding that A.C. Castle was "the employer of the affected workers at the site." Allstate Painting & Contracting Co., 21 BNA OSHC 1033 (Nos. 97-1631 & 97-1722, 2005); see also 29 U.S.C. § 658(a). The ALJ reached this finding after properly placing the burden of proof on the Secretary. See Allstate, 21 BNA OSHC 1033. In now challenging that finding on appeal, A.C. Castle raises three issues: (1) whether substantial evidence supports the ALJ's conclusion that Provencher was a supervisory employee of A.C. Castle, (2) whether the ALJ erred in treating A.C. Castle and PHI as a single employer, and (3) whether the Secretary of Labor violated A.C. Castle's right to fair notice in treating PHI and A.C. Castle as a single employer where before it had not. We address these issues in turn.

## A.

Brian LeBlanc is the owner and sole manager of A.C. Castle, which has its principal place of business at LeBlanc's home in Danvers, Massachusetts. A.C. Castle normally operates as a general contractor and claimed no direct employees of its own at the time of the OSHA investigation. LeBlanc was friends with

- 4 -

Provencher, who was the sole proprietor of PHI, a construction subcontracting company based at Provencher's home in Beverly, Massachusetts. LeBlanc and Provencher had been friends for over thirty years at the time of the OSHA investigation. In 2015, ninety-five percent of Provencher's income came from A.C. Castle. Provencher estimated that generally around seventy-five percent of his projects came from A.C. Castle, as he occasionally performed work for other general contractors.

The ALJ found that Provencher was employed by A.C. Castle as a supervisor of the workers on the Wenham job site. In reaching this conclusion, the ALJ applied the common law agency test set forth by the Supreme Court in Darden. See Darden, 503 U.S. at 324-24. A.C. Castle argues that the record lacks substantial evidence to support the ALJ's conclusion in applying that test, as evidenced by the ALJ's failure to consider many of the Darden factors, and an undue reliance on facts that are typical of the relationship between a general contractor and a subcontractor.

> Darden's test is as follows:
>
> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the

> parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Darden, 503 U.S. at 323-24 (internal quotation marks and citation omitted).

In applying this multifactor test,

> [A]ll of the incidents of the relationship must be assessed and weighed with no one factor being decisive. However, in most situations, the extent to which the hiring party controls the manner and means by which the worker completes her tasks will be the most important factor in the analysis.

Alberty-Vélez v. Corporación de P.R. Para La Difusión Pública, 361 F.3d 1, 7 (1st Cir. 2004) (internal quotation marks and citations omitted).

The ALJ properly focused on the most important factor, control, finding that LeBlanc "exercised an unusual amount of control over Mr. Provencher's actions, atypical of a traditional contractor/subcontractor relationship." In expanding on this finding, the ALJ also looked at the source of instruments and tools, the assignment of work, the length of the relationship, and the hiring of other workers. Specifically, the ALJ stated:

> Mr. LeBlanc and Mr. Provencher had a thirty-year working relationship. Mr. LeBlanc

scheduled the roofing projects and told Mr. Provencher in what order they were to be done, which necessarily determined the location of the work. Mr. LeBlanc arranged for the building materials to be delivered to the worksites and provided the dump truck . . . . He also arranged for the only safety training provided to the roofing crew and provided Mr. Provencher with a copy of A.C. Castle's safety program and instructed him to implement it. Mr. LeBlanc told Mr. Provencher when he needed to hire more employees to complete the contracted roofing projects on time. Mr. Provencher paid the roofing crew members on Fridays, after he received payment from Mr. LeBlanc. Mr. Provencher did not have a business license and could not bid on projects; he was dependent on A.C. Castle for the great majority of his work. Mr. LeBlanc conducted spot inspections on Mr. Provencher's worksites and instructed him to abate specific safety infractions.

LeBlanc also appears to have directed Provencher to double up the spruce planks sold at the hardware store when used as scaffolding (a direction ignored on the day of the accident). LeBlanc gave Provencher (who had no credit cards or money on hand) interest-free loans to purchase equipment and materials, which LeBlanc docked in $500 increments from amounts otherwise due to Provencher. LeBlanc influenced when that equipment needed to be replaced. For example, he told Provencher he "probably need[ed] new ladders" and then loaned the funds to buy them. LeBlanc also let Provencher purchase materials on A.C. Castle's account at the local hardware store, where A.C. Castle received a discount. Provencher could not complete purchases on A.C. Castle's account

without the clerk first calling LeBlanc for authorization. A.C. Castle also provided tee-shirts and sweatshirts with A.C. Castle's logo for Provencher and other PHI workers to wear.

LeBlanc was also involved in the hiring and firing of PHI's workers. On several occasions when PHI needed to hire workers, LeBlanc placed ads in the newspaper on Provencher's behalf because, without a credit card, Provencher could not do so himself. Provencher would inform LeBlanc when he had trouble with worker attendance. He would ask LeBlanc for help firing absentee workers, saying on one occasion to LeBlanc, "You need to get rid of this guy." LeBlanc would also suggest to Provencher how large a crew he would need to hire for a given project.

A.C. Castle argues that the foregoing findings describe only the close coordination often necessary between a general contractor and a subcontractor. Certainly, it is fair to say that such coordination often exists between such entities. After all, a principal role of the general contractor is to coordinate the work of the subcontractors. Here, though, we have a recurring relationship with one general contractor and one subcontractor in which the general exercises control not only over the timing and scope of the work, but also over the details of how the work is performed, and over many internal operations of the subcontractor, particularly the managing of personnel and equipment.

A.C. Castle correctly points out that the evidence was not one-sided. Provencher provided many of the tools Provencher and PHI workers used, did some small amount of work for other parties, signed contracts as a subcontractor for each job, was not paid in the form of a salary, and received an IRS Form 1099 rather than a W-2. In nevertheless deciding that all of the evidence collectively described a principal-agent relationship, the ALJ considered how A.C. Castle itself portrayed the relationship in dealing with regulators and customers. For each building permit, A.C. Castle was required to submit an affidavit stating who held the workers' compensation insurance for the project. The form affidavit gave LeBlanc a choice: "I am an employer with [blank] employees," or "I am a general contractor and I have hired the sub-contractors listed on the attached sheet." In the forms on record, LeBlanc did not identify himself as a general contractor or Provencher as a subcontractor. Instead, he checked the employer box and filled in the number of workers. LeBlanc also made sure that his customers understood that all the workers on the project were his employees. To that end, he prohibited Provencher from describing himself to the customer as a subcontractor. And, as noted, A.C. Castle furnished the workers with tee-shirts bearing A.C. Castle's name, and placed A.C. Castle signs at each worksite. The ALJ found LeBlanc's insurance affidavits, as confirmed by his representations to customers, to be credible descriptions of his

relationship with Provencher, and his attempts to recant those statements not credible.

A.C. Castle's representations were, in substance, representations that he controlled Provencher as an employee, not as an independent subcontractor. We see no error in the weight the ALJ gave to those representations in making the fact-intensive conclusion that the relationship between A.C. Castle and Provencher, for purposes of this case, is best seen as that of employer and employee. And with those representations added to the other facts in the record elucidating their distinctive relationship, there is enough to provide substantial evidence for the ALJ's conclusion.

## B.

The ALJ might well have concluded her analysis after determining that Provencher was a supervisory employee of A.C. Castle. After all, the only other workers involved at the worksite were those whom Provencher in turn supervised, and who were presented as A.C. Castle employees in A.C. Castle's various representations. And that was, in substance, what the Secretary argued. Instead, the ALJ essentially gave A.C. Castle a second bite at the apple by also assessing the relationship between A.C. Castle and Provencher under the Commission's "single employer" test.

That test appears to have originated in Advance Specialty Co., 3 BNA OSHC 2072 (No. 2279, 1976). In that case, the Commission pointed to the practice of the National Labor Relations Board in treating as a single entity two businesses where there is "a combination of most or all of the following factors: a common worksite, a common president or management, a close interrelation and integration of operations, and a common labor policy." Id. at *3. Without explanation, the Commission reformulated that test to hold that "when . . . two companies share a common worksite such that the employees of both have access to the same hazardous conditions, have interrelated and integrated operations, and share a common president, management, supervision or ownership, the purposes of the [OSH Act] are best effectuated by the two being treated as one." Id. at *4. The Commission's reformulation, unlike the NLRB formulation of its rule, seems to require that all three (rather than a combination of most) factors be satisfied in order to treat two employers as one. Nevertheless, the Commission itself has since described its rule as "essentially adopt[ing] the 'single employer' concept of the [NLRB]." C.T. Taylor Co., 20 BNA OSHC 1083 (Nos. 94-3241 & 94-3327, 2003). One reviewing court has presumed the two tests to be the same, see Altor, Inc. v. Sec'y of Labor, 498 Fed. Appx. 145, 148 n.3 (3d Cir. 2012), while another has pointed out their differences, see Solis v. Loretto-Oswego Residential Health Care Facility, 692 F.3d

- 11 -

65, 74 (2d Cir. 2012), as well as the predominance of a four-factor version of the test in other statutory contexts, id. at 73-74 (referencing the Labor Management Relations Act, the Fair Labor Standards Act, and the Age Discrimination in Employment Act (citing Pearson v. Component Tech. Corp., 247 F.3d 471, 486 (3d Cir. 2001) (collecting cases))).

For our purposes, we can ignore any uncertainty about the precise nature of the test, as the ALJ employed the three-factor formulation in a straightforward fashion, and neither party challenges the ALJ's stated formulation. Rather, the parties train their arguments on whether the ALJ properly found all three factors to be present to the extent that they warranted treating A.C. Castle as the employer of the affected workers. Our role in assessing those arguments is limited. We ask only whether the ALJ's findings of fact are supported by substantial evidence considering the record as a whole, 29 U.S.C. § 660(a); P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 675 F.3d 66, 72 (1st Cir. 2012), and whether the findings are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, 5 U.S.C. § 706(2)(A); Capeway Roofing Sys., Inc. v. Chao, 391 F.3d 56, 58 (1st Cir. 2004). With these standards in mind, we turn to the ALJ's precise findings and A.C. Castle's critique of those findings.

## 1. Common Worksite

The ALJ found that A.C. Castle and PHI shared as a common worksite the Parsons Hill Road home roofing site where the accident occurred. A.C. Castle argues that the common worksite test directs our attention to the "business address" of the two entities, rather than to the location at which their employees worked. While a shared headquarters or business address generally satisfies the common worksite factor, A.C. Castle points to no precedent indicating that a common business address or headquarters is necessary to satisfy this factor. And to rule that it is essential would rewrite the test as stating "common business address" rather than "common worksite," which is the term used in Advance Specialty. 3 BNA OSHC 2072, at *4. Given the Act's focus on worker safety, see 29 U.S.C. § 651, it is not unreasonable to look to the location at which the employees worked and were exposed to workplace hazards, i.e., the "worksite," not just the "business address." For this reason, we find nothing arbitrary, capricious, abusive, or violative of the law in the ALJ's finding that the construction site was the relevant site in applying the common worksite test.

At the same time, we agree with A.C. Castle that in cases involving general contractors and subcontractors, the common worksite factor as construed by the ALJ in this case will almost always be satisfied. In our view, though, all this means is that

in this industry this factor carries with it less probative force than it otherwise might in decreeing two companies to be one and the same. And the other prongs of the test ensure that this factor alone is not dispositive.

A.C. Castle also argues that even the construction worksite was not common in this case because LeBlanc was not at the site when the accident occurred, and thus he was not exposed to the hazardous conditions. But LeBlanc had been to the site to secure and arrange the work, and A.C. Castle points to no precedent holding that workers from each entity must be at the site at the time the violation occurred, or directly exposed to the risk. Also, Provencher supervised the roofing crew that set up the faulty scaffolding apparatus at the worksite, and was himself physically present at the site shortly before the accident. As we have explained above, the ALJ reasonably treated him as an employee of A.C. Castle. So in that sense, A.C. Castle was present at the worksite.

## 2. Interrelated and Integrated Operations

The same factual findings employed in deeming Provencher to be a supervisory employee of A.C. Castle make clear that the operations of A.C. Castle and Provencher's sole proprietorship were integrated to a degree well beyond what one would expect to find in the customary relationship between a general contractor and a subcontractor. The integration of their operations also

notably included the pertinent subject of workplace safety: PHI had no safety program of its own, and LeBlanc arranged for and at times paid for PHI workers to receive OSHA trainings hosted at LeBlanc's home. LeBlanc gave Provencher a binder containing A.C. Castle's safety policies and instructed Provencher to follow its dictates. See C.T. Taylor, 20 BNA OSHC at 1087 ("[T]reating these two companies as one is an effective way of addressing the fact that, on this particular occasion, Taylor and Esprit handled safety matters as one company.")

As we have already discussed, A.C. Castle fairly protests that any integration was not complete. PHI did some work for other general contractors. There was no common payroll or benefits system. Provencher had his own workers' compensation insurance for his workers, and he had his own CPA. So, too, it is fair to say that some degree of direction is customarily given by general contractors to their subcontractors. For all of these reasons, we agree that this factor weighed only lightly in favor of a single employer finding. But, as with the common worksite factor, we see no abuse of discretion in finding that the weight of this factor, while small and likely insufficient in the normal case of construction general contractors and subcontractors, nevertheless incrementally added to the balance building in the direction of the ALJ's finding.

### 3. Common Management or Supervision

It is the final factor that provides the added heft necessary to tilt the balance in favor of the ALJ's single employer determination. As we have explained, the ALJ found that Provencher was a supervising employee of A.C. Castle. Whether that finding by itself might have justified holding A.C. Castle liable, as argued by the Secretary, we need not decide. The ALJ made more modest use of her finding that Provencher was A.C. Castle's supervisory employee, using it to support the conclusion that there was common management or supervision. And certainly it provides strong support for that conclusion, as it leaves a single line of management running from LeBlanc through Provencher to the workers supervised by Provencher. In short, the ALJ effectively found not a single employer merely because two employers acted as one; rather, she effectively found that there was only one employer. And, as explained above, substantial evidence supported that conclusion. We therefore find no reason to upset the ALJ's conclusion on the single employer test.

### c.

Because OSHA had previously treated PHI and A.C. Castle as distinct entities, A.C. Castle says it lacked fair notice that

OSHA would treat it as the employer of the PHI workers in this instance.  We reject this argument.

The fair notice rule applies in scenarios in which OSHA informs a company (or suggests to it) "that its procedures or processes are safe and satisfactory," but then issues a citation for the "same procedures in a later inspection."  Trinity Marine Nashville, Inc. v. Occupational Safety & Health Review Comm'n, 275 F.3d 423, 430 (5th Cir. 2001).  Here, OSHA did not represent to A.C. Castle that any particular process or procedure complied with its rules.  Instead, upon learning new information about the relationship between A.C. Castle and PHI, OSHA found it appropriate to cite the two companies together for violations related to the October 2014 accident.  Neither the Commission's single employer test nor the Darden common law test were a secret to A.C. Castle. And the very fact that those inquiries are so fact-intensive means that for a given worksite inspection, the Secretary of Labor may or may not have grounds to treat two ostensibly distinct companies as one.  Thus, we agree with the ALJ that A.C. Castle's fair notice argument has no merit.

## III.

A.C. Castle also challenged before the ALJ, and challenges on appeal, the Secretary's claim that A.C. Castle willfully violated a rule requiring that any scaffold component be capable of supporting its own weight and at least four times the

maximum intended load (Citation 2, Item 1:  violation of 29 C.F.R. § 1926.451(a)(1)).  A violation of an OSHA rule is "willful" when the relevant company actor exhibits "plain indifference" toward a safety requirement or when he or she has evidenced a state of mind such that, lacking actual knowledge of a given rule, if he or she were informed of the requirement, "he [or she] would not care."  Brock v. Morello Bros. Const., Inc., 809 F.2d 161, 164 (1st Cir. 1987); see also Kaspar Wire Works, Inc., 18 BNA OSHC 2178 (No. 90-2775, 2000).

Provencher, the supervisor of the roofing crew, purchased the rough spruce planks that did not meet OSHA regulations.  The planks were incapable of supporting their weight and four times the maximum intended load, as 29 C.F.R. § 1926.451(a)(1) required.  Provencher claimed not to know that these planks were identified by the hardware store he and LeBlanc patronized as "not for stagin[g]," and thus were not graded for use in scaffolding.  And Provencher seemed not to care that the planks were of a quality insufficient to support the weight required.  He admitted that even if he had known that the boards he purchased for the scaffolding were not suitable for use as staging -- which would have indicated to him that they could not support the required load -- he may have used them anyway.  This admission demonstrates sufficient indifference to the requirements of 29 C.F.R. § 1926.451(a)(1) to constitute willfulness under the

rule set forth in Brock. Moreover, the evidence that Provencher used these planks for over twenty years, that the receipts from the hardware store always showed that they were "not for stagin[g]," and that LeBlanc knew Provencher used these planks for scaffolding and apparently instructed Provencher to double them up, supports the ALJ's conclusion that the "willful" standard has been met.

## IV.

For the foregoing reasons, we deny A.C. Castle's petition for review.