11-888-ag
Solis v. Loretto-Oswego Residential Health Care Facility

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: February 21, 2012　　　Decided: August 13, 2012)

Docket No. 11-888-ag

---

HILDA L. SOLIS, SECRETARY,
UNITED STATES DEPARTMENT OF LABOR

*Petitioner*,

− v. −

LORETTO-OSWEGO RESIDENTIAL HEATH CARE FACILITY

*Respondent.*

---

Before: CALABRESI, SACK, and HALL, *Circuit Judges*.

The Secretary of Labor, Hilda L. Solis, petitions for review of a decision by the Occupational Safety and Health Review Commission holding that Occupational Safety and Health Act violations by Loretto-Oswego Residential Health Care Facility were not "repeated" under 29 U.S.C. § 666(a). The Commission reached this conclusion upon finding that the facility and several previously cited entities were not a single employer for purposes of the Act. In her petition for review, the Secretary contests the Commission's view of the standard for assessing single employer status. She also challenges the Commission's single employer analysis in this case and its weighing of the evidence.

Finally, the Secretary contends that the Commission erroneously rejected certain factual findings made by an administrative law judge. We DENY the petition for review.

JORDANA WILSON, Attorney, U.S. Department of Labor (Joseph M. Woodward, Associate Solicitor of Labor for Occupational Safety and Health, and Charles F. James, Counsel for Appellate Litigation, *on the brief*), *for* M. Patricia Smith, Solicitor of Labor, Washington D.C., *for Petitioner*.

SUBHASH VISWANATHAN, Bond, Schoeneck & King, PLLC (Katherine A. Ritts, *on the brief*), Syracuse, N.Y., *for Respondent*.

CALABRESI, *Circuit Judge*:

In 2002, the Occupational Safety and Health Administration ("OSHA") issued citations to Loretto-Oswego Residential Health Care Facility ("Loretto-Oswego") for violating employee safety standards under the Occupational Safety and Health Act (the "OSH Act"). Loretto-Oswego reached an agreement with OSHA officials settling all matters related to the citations save one: whether several violations were "repeated" under 29 U.S.C. § 666(a). This question, the parties agree, depends entirely on whether Loretto-Oswego and a pair of other entities operated as a single employer for purposes of the OSH Act. An administrative law judge ("ALJ") found that the three entities did operate as a single employer, and hence held that the violations were repeated. Loretto-Oswego appealed that decision to the Occupational Safety and Health Review Commission (the "Commission"), which reversed. The Secretary of Labor, Hilda L. Solis (the "Secretary"), now petitions for review of the Commission's decision. We DENY her petition.

# BACKGROUND

At the time of the citations in question, Loretto Management Corporation ("LMC") oversaw a number of non-profit corporations (the "affiliates") that operated nursing home facilities in upstate New York. These corporations, nearly all of which used the "Loretto" name, included Loretto-Oswego, which operated a nursing home in Oswego, New York.[1] They also included, among others, Loretto-Rest Residential Health Care Facility ("Loretto-Rest") and Loretto-Utica Residential Health Care Facility ("Loretto-Utica"), which operated nursing homes in Syracuse and Utica, New York, respectively. Loretto-Rest had 520 beds, while Loretto-Utica had about 200 beds and Loretto-Oswego had 120 beds. LMC's headquarters were located on the same site as Loretto-Rest, known as the Brighton "campus."

In light of past violations by Loretto-Rest and Loretto-Utica, OSHA designated several of the citations it issued to Loretto-Oswego as "repeated." The citations issued to Loretto-Oswego alleged that the facility did not comply with OSHA standards regarding eye protection, hepatitis B vaccination, medical evaluations, bloodborne pathogen training, oxygen cylinders, machinery servicing, and electrical equipment. The Secretary asserted that LMC oversaw Loretto-Oswego, Loretto-Rest, and Loretto-Utica so that these entities functioned as a "single employer" at the time of the alleged violations. Loretto-Oswego does not dispute that, if they were a single employer, the violations were repeated. The parties agree, moreover, that if the violations were repeated, Loretto-Oswego must pay a penalty of $56,250, and if they were not, then Loretto-Oswego must pay only $11,250.[2]

---

[1] Loretto-Oswego has since ceased active operations; the facility is now closed.
[2] The lesser fine would be under 29 U.S.C. § 666(b), which penalizes "serious" violations.

3

LMC's bylaws describe, at a minimum, potential control by LMC over the affiliates. The bylaws state: "The Corporation will control, oversee, coordinate, represent and support the interests of all present and future Loretto Corporations." J.A. 459.[3] After listing various "Loretto Corporations,"[4] including the three affiliates at issue here, they continue:

> The Corporation reserves to itself the following powers for each affiliate:
>
> (a) Approval of annual operating and capital budgets.
>
> (b) Approval of the employment of the chief executive officer.
>
> (c) Access to all information regarding the operation of the affiliate including financial statements, minutes of board meetings and committee meetings, and any other relevant data.
>
> (d) Participation and cooperation by each affiliate with the Corporation and the other affiliates in all matters of common interest.

J.A. 459-60. Under the bylaws, a Board of Trustees is to supervise a president who, as the chief executive officer of LMC, "shall have and exercise charge and supervision of the implementation of the goals and policies of the Corporation though operation of its facilities and personnel." J.A. 454. The bylaws also set out descriptions of several other salaried LMC employees, including a chief financial officer and several vice-presidents.

What LMC actually did with the above mentioned management authority is a more complicated question. Formally, at the time of Loretto-Oswego's violations, the three affiliates had the same president and chief executive officer (James Introne, who also was LMC's president and chief executive officer) and chief financial officer (Michael Sullivan, who also was LMC's chief operating officer). In these roles, Introne had the power to hire, discipline, and fire the administrators and other personnel at the affiliates, while Sullivan oversaw all accounting functions for LMC and the affiliates, including budgeting and

---

[3] References to "J.A." refer to the Joint Appendix.

[4] The bylaws, adopted in August 1998, list seventeen such corporations. Several of the corporations appear to refer to the same residential care facilities. It lists as corporations, for example, both "Loretto Rest Residential Health Care Facility" and "Loretto Rest, Inc." J.A. 459.

strategic planning. Loretto-Rest's management further overlapped with LMC's in various ways, with dual-listed employees charged to oversee LMC affiliates on issues they personally managed for Loretto-Rest.

Loretto-Oswego, by contrast, had less direct contact with LMC. Introne delegated to Karen Jeffreys, the affiliate's licensed administrator, his power to hire, fire, and discipline Loretto-Oswego employees.[5] He retained the authority to terminate Jeffreys, but the record does not disclose any specific directions, as opposed to general oversight, that he gave in relation to Loretto-Oswego's operations. Jeffreys, moreover, prepared Loretto-Oswego's budget. Although LMC's Board of Trustees had final say over budgetary approval and LMC employees reviewed Loretto-Oswego's finances, the record contains no evidence that Sullivan or the Board dictated Jeffreys' budgetary decisions. There is evidence that LMC employees provided guidance and training to Loretto-Oswego employees on various issues. The record, however, indicates only a few concrete instances, outlined below, in which these actions translated into particular policy prescriptions for Loretto-Oswego.

Introne oversaw Loretto-Oswego, primarily, through Mitchell Marsh. Marsh served as LMC's "Vice President of Residential Health Care Facilities" and, simultaneously, as the licensed administrator of both Loretto-Rest and another Loretto affiliate, Nottingham. According to Marsh, his positions as administrator were his primary responsibility. In his role at LMC, Marsh testified, he acted as the company's liaison to Loretto-Oswego and Loretto-Utica. This job consisted, in Marsh's words, of ensuring that the facilities met

---

[5] It appears that Introne delegated corresponding powers to the administrators of Loretto-Rest and Loretto-Utica. In New York, nursing home administrators must hold a license issued by the State Department of Health, and nursing homes operate under the license of their individual administrators. *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 96.1(n).

Introne's "standards," namely that they kept balanced budgets and complied with state and federal regulatory requirements. J.A. 215-16.

Marsh visited Loretto-Oswego and Loretto-Utica about once a month, when he would review financial statements and clinical reports and then conduct a walkthrough, surveying the environment and the residents. He also completed annual performance evaluations of the site administrators for Introne. In his testimony, Marsh emphasized actions he took to ensure compliance with New York State Department of Health requirements regarding resident care. On a few occasions, he organized mock inspections of the facilities to practice for state resident care inspections. As to employee safety requirements under the OSH Act, Marsh testified that he would be advised of OSHA citations issued to the facilities and would inform Introne of them.

Four other individuals played a particularly prominent role in the Secretary's case: Scott LaRue, Anthony Tullio, Gregg Lawson, and Arthur Coughlin. LaRue served as LMC's "Vice President for Support Services." In this role, LaRue testified, he spent 95 percent of his time managing the housekeeping, maintenance, food service, and human resources operations at Loretto-Rest, and advised other affiliates on request. Tullio was Loretto-Rest's "Director of Support Services." He testified that he managed housekeeping, maintenance, and laundry at Loretto-Rest, while also providing information and training in these areas to other affiliates. Although Tullio nominally was responsible to Loretto-Rest's administrator, Marsh, in fact Tullio reported to LaRue. Lawson also reported to LaRue, and served as LMC's "Corporate Human Resource Manager," managing benefits, payroll, and labor relations. According to Lawson, he spent 90 to 95 percent of his time on matters related to Loretto-Rest and the remainder consulting for other affiliates as needed. Lawson

testified that it was his responsibility to ensure that all affiliates complied with federal employment laws like the Family Medical Leave Act.

Coughlin oversaw aspects of employee safety and workers' compensation at the affiliates beginning in November 2001. LaRue testified that he hired Coughlin to manage these issues at Loretto-Rest and instructed him to write a safety program for Loretto-Rest that the other affiliates could adopt if they wished. On March 1, 2002, Coughlin circulated to the affiliates a memorandum detailing a corporate-wide safety policy. The policy addressed a long list of workplace hazards and stated: "[F]ailure to adhere to written corporate safety policies and rules will be considered serious infractions and will result in disciplinary actions, up to and including termination." J.A. 502. The memorandum also stated that LMC's safety manager was responsible for "recommending corporate-wide health and safety policies; ensuring overall corporate compliance with policies, statutes, and regulations; monitoring the effectiveness of the safety programs; and providing central health and safety services to all areas of Loretto." J.A. 501. LaRue and Coughlin testified that the policy, contrary to its terms, could only be enforced at Loretto-Rest. LaRue claimed that he had not had a chance to review most of Coughlin's "over-zealous" policy until after it had been sent to the affiliates. J.A. 397.

OSHA inspectors identified the alleged violations in February 2002, shortly before Coughlin circulated this policy. Prior to the inspection, the affiliates had adopted and renewed a common policy regarding bloodborne pathogen exposure, particularly exposure to HIV and to Hepatitis B and C. This policy, drafted and updated by Melva Neff, a nurse at Loretto-Rest, spoke of general requirements for "Loretto." Neff testified that she brought copies of the policy to meetings attended by representatives of LMC and the affiliates. She

7

also testified that she provided trainings on bloodborne pathogen exposure at sites other than Loretto-Rest upon request, including at Loretto-Oswego. Additionally, prior to the inspection, Loretto-Oswego adopted two targeted safety policies that apparently derived from other affiliates. These policies referred to other affiliates by name and did not refer to Loretto-Oswego. One policy, seemingly from Nottingham, concerned procedures for turning off machinery while it is serviced, known as lockout/tagout safety, and contained written procedures that referred to Loretto-Rest. The other policy, which listed the name and address of Loretto-Rest on its cover, addressed hazard communication. Coughlin testified that he provided training and assistance to affiliates regarding employee safety as needed, but he did not visit Loretto-Oswego at any time before the inspection.

When the inspectors first arrived at Loretto-Oswego, on February 14, 2002, Jeffreys informed them that LMC was Loretto-Oswego's controlling corporation. She then requested, after phoning LMC, that the inspectors wait until two individuals sent by LMC had arrived: Coughlin and Tullio. The inspectors agreed. During the inspection, conducted in part that day and in part on February 20, 2002, Coughlin and Tullio accompanied the inspectors with Jeffreys and Darlene Nesbitt, Loretto-Oswego's director of facilities. Coughlin identified himself as "Corporate Safety Manager" and brought a copy of the soon-to-be circulated safety policy. At times, Jeffreys referred questions to Coughlin and Tullio; she also excused herself at various points to deal with other issues at the facility. When the inspectors found violations, Coughlin and Tullio instructed Loretto-Oswego employees to correct them. At a conference after the inspection, Coughlin gave abatement dates for those violations that had not yet been corrected. And at two final settlement conferences, held in

March 2002, Coughlin pointed out to the inspectors those violations that had been corrected.

In the course of the inspection, the inspectors spoke with Loretto-Oswego and LMC employees about the relationship between the two entities. Most important for the Secretary are two statements attributed to LaRue, who was also present at the settlement conferences. At one of the conferences, LaRue allegedly told the inspectors that Coughlin was responsible for going to all LMC affiliates and ensuring that they took care of safety issues. In his testimony before the ALJ, LaRue did not recall making this statement to the inspectors. In a subsequent visit by an inspector to LMC's offices, LaRue also allegedly stated that LMC's Board of Trustees could influence the staff at Loretto-Oswego and that, depending on the area, he and Marsh could as well. According to the inspector, Dwayne Gary, LaRue identified finance, human resources, and information technology as areas in which they could exercise their influence. This alleged statement by LaRue was in tension with the implication of other testimony that LMC employees could only give advice to Loretto-Oswego.

The Secretary has also highlighted a range of other indicators of interrelation between LMC and the affiliates. These, as summarized in the ALJ's decision, included the following: (1) the administrators of all the affiliates gathered for monthly meetings at Loretto-Rest to share information; (2) Loretto-Rest operated a central food commissary, which provided food to all but one of the affiliates and five non-affiliate nursing facilities; (3) a single "Loretto" website listed job opportunities for the affiliates and listed benefits for "Loretto" employees; (4) all service and maintenance employees at the affiliates belonged to the same union; the labor contracts entered by the affiliates, while separate, were negotiated

at the same time; and Introne signed the labor contract entered by each affiliate; and (5) the same insurance agency handled all affiliate workers' compensation claims.

The record contains conflicting testimony regarding the employing entity of some of the individuals described above. Marsh testified that he was an employee of Loretto-Rest, not LMC, and testified that Jeffreys did not report to him. But Jeffreys and Neff both identified Marsh as an employee of LMC, and LaRue initially did as well, though in later testimony he identified Marsh as an employee of Loretto-Rest. LMC's organizational chart and, by implication, its bylaws identified Marsh as an employee of that entity; Jeffreys, moreover, testified that she reported to Marsh.[6] Tullio and Coughlin testified that they were employed by Loretto-Rest rather than LMC. The record suggests, however, that Tullio and Coughlin reported to LaRue, an employee of LMC, and did not report to Marsh, who would have been their supervisor at Loretto-Rest. Finally, Neff stated at a deposition that she worked for LMC, but later testified she was an employee of Loretto-Rest; she explained that after her deposition Marsh had told her she was employed by Loretto-Rest.

On these facts, the ALJ upheld the Secretary's "repeated" designation, holding that LMC and its affiliates operated as a single employer. *Sec'y of Labor v. Loretto-Oswego Residential Health Care Facility*, Nos. 02-1164 & 02-1174, slip op. (A.L.J. Dec. 29, 2003), *available at* http://www.oshrc.gov/decisions/pdf_2011/02-1164.pdf (*Loretto-Oswego I*).

In so holding, the ALJ described the "single employer" test, under Commission precedent, as follows: "'when . . . two companies [1] share a common worksite such that employees of both have access to the same hazardous conditions, [2] have interrelated and integrated operations, and [3] share a common president, management, supervision or

---

[6] The organizational chart lists Marsh as "Vice President" of Residential Health Care Facilities, and LMC's bylaws state that vice presidents "shall be employees of the Corporation." J.A. 464.

10

ownership, the purposes of the Act are best effectuated by the two being treated as one.'" *Id.* at 7 (quoting *Sec'y of Labor v. Advance Specialty Co., Inc.*, No. 2279, 1976 WL 22254, at \*4 (O.S.H.R.C. Mar. 5, 1976)). The ALJ then found that each of the three prongs had been met.

As to common worksite, the ALJ held that although the affiliates were geographically distinct, they presented the same employee health risks. *Id.* at 8-9. As to common management, the ALJ held that LMC's employees had the power to oversee the actions of the affiliates. *Id.* at 9-22. In this respect, the ALJ found that Marsh, Tullio, Coughlin, and Neff were all employees of LMC and did not credit testimony "to the effect that Loretto facilities operate as separate, independent entities and that administrators at individual facilities are free to disregard Loretto policies and the 'advice and counsel' of Loretto management." *Id.* at 20. The ALJ specifically rejected LaRue and Coughlin's testimony that the affiliates did not need to comply with LMC's safety policy. *Id.* Finally, the ALJ held that LMC and the affiliates had sufficiently interrelated and integrated operations to constitute a single employer, particularly given Sullivan's oversight of affiliate finances, Marsh's oversight of the administrators, Coughlin's position as safety manager, and the actions of LaRue, Coughlin, and Tullio at the inspection. *Id.* at 22-26.

On appeal, the Commission reversed, applying the same three-factor single employer test. *Sec'y of Labor v. Loretto-Oswego Residential Health Care Facility*, Nos. 02-1164 & 02-1174, 2011 WL 95330 (O.S.H.R.C. Jan. 7, 2011) (*Loretto-Oswego II*). It noted, first, that LMC and the three affiliates shared the same president, chief executive officer, and chief financial officer. *Id.* at \*2. It held, however, that this "outward appearance of a common identity" gave way upon a closer look at the ways in which LMC and the affiliates had operated. *Id.*

Although LMC oversaw Loretto-Oswego's affairs in certain respects, the Commission held, it rarely intervened or dictated policy. The Commission found that the evidence of integration was particularly weak in relation to safety matters at the time of the inspection. At that time, it found, Coughlin's safety policy was not in effect and Neff's bloodborne pathogen policy only addressed a single aspect of employee safety at the affiliates. *Id.* at *3. The Commission held that notwithstanding LMC's involvement in the inspection, there was little evidence that LMC personnel addressed employee safety matters in their interactions with Loretto-Oswego. *Id.* at *3-4. Lastly, the Commission found that Loretto-Oswego did not share a common worksite with LMC or the other two affiliates, as the entities were located in different cities. *Id.* at *4. Given the lack of integration and the lack of a common worksite, the Commission held that Loretto-Oswego and the other affiliates did not operate as a single employer. *Id.*

The Secretary timely petitioned for review, challenging aspects of the Commission's legal analysis and the sufficiency of the evidence supporting its conclusion. We have jurisdiction pursuant to 29 U.S.C. § 660(b). Venue is appropriate given that the violations in question occurred in this circuit. *See id.*

## DISCUSSION

We will uphold an order by the Commission unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 226 (2d Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)) (internal quotation marks omitted). Under this standard, we review the Commission's legal conclusions de novo, deferring as appropriate to the Secretary's reasonable interpretation of the OSH Act. *Id* at 226-27. We must uphold the Commission's findings of fact if they are

12

supported by substantial evidence. *D.A. Collins Constr. Co. v. Sec'y of Labor*, 117 F.3d 691, 694 (2d Cir. 1997) (citing 29 § U.S.C. 660(a)).

## I.

The Secretary asserts, first, that she has adopted a variant of the single employer test different from the one applied by the Commission and the ALJ. Without explaining how she adopted this different variant, the Secretary argues that, under her variant, we should look to four factors: (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. The formal contrast between this test and the Commission's three-prong test is clear enough: the Secretary's test omits the Commission's common worksite prong, divides common management and common ownership into two prongs, and adds a centralized control of labor relations prong.

This four-factor test is not a novelty of this litigation. The National Labor Relations Board ("NLRB") has long utilized it in construing the term "employer" under the National Labor Relations Act ("NLRA"). In *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256 (1965), the Supreme Court approved of the test as applied under the NLRA. This court has subsequently applied it under that statute and in construing the term "employer" under both Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act ("ADA"). *See Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996) (per curiam) (NLRA); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995) (Title VII); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000) (ADA). Other federal courts have employed the four-factor test under all these statutes as well as other labor statutes, including the Labor Management Relations

13

Act, the Fair Labor Standards Act, and the Age Discrimination in Employment Act. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 486 (3d Cir. 2001) (collecting cases).

In the Secretary's view, the same single employer test should apply under the OSH Act as under the NLRA and analogous labor statutes. The Secretary argues that her position on this issue of statutory construction is entitled to deference. She advances two arguments. First, she contends that the remedial purposes of the OSH Act and the breadth of its definitions of "employer" and "person" suggest applying the "same liberal construction" of the single employer test to that Act as to the others. Pet'r's Br. 35-36. Second, she claims that the Commission initially adopted the NLRB's four-factor test in construing the term "employer" under the OSH Act and, without explanation, substituted its three-factor test for the four-factor test. The Secretary asserts, and Loretto-Oswego does not dispute, that no federal court of appeals has spoken to the content of the single employer test under the OSH Act. Likewise, we are not aware of any federal cases that address the issue.

As a preliminary, the Secretary has not shown that the Commission initially applied the four-factor NLRB test and then reformulated its test in subsequent cases. According to the Secretary, the Commission applied the NLRB test in *Advance Specialty Co.*, the same decision the ALJ in this case quoted as enumerating the three-factor test the Secretary challenges. In *Advance Specialty Co.*, the Commission described the NLRB's test with approval after noting that it was "well settled that corporate entities may be disregarded in order to effectuate a clear legislative purpose." *Advance Specialty Co.*, 1976 WL 22254 at *3. It did not adopt the NLRB test, however; instead, the Commission held that the entities at issue operated as a single employer under the OSH Act given that they shared "a common worksite such that the employees of both have access to the same hazardous conditions,

14

ha[d] interrelated and integrated operations, and share[d] a common president, management, supervision or ownership." *Id.* at *4. The Commission has looked to these same three factors ever since. *See Sec'y of Labor v. C.T. Taylor Co.*, Nos. 94-3241 & 94-3327, 2003 WL 1961272, at *3-4 (O.S.H.R.C. Apr. 26, 2003); *Sec'y of Labor v. Vergona Crane Co.*, No. 88-1745, 1992 WL 184539, at *1-2 (O.S.H.R.C. July 22, 1992).[7]

In any event, although we have concluded that the Secretary's interpretation of the OSHA Act, even if expressed solely as a litigation position, is due more deference than the Commission's interpretation of the statute, *see Chao*, 291 F.3d at 227-28, we need not entertain the Secretary's position where, as here, that position was not pressed to the Commission during the adjudicatory process from which the Secretary appeals. The Secretary never argued to the Commission that the ALJ applied an improper variant of the single employer test. Indeed, the Secretary spent much of her brief to the Commission defending the single employer test without distinguishing between variants, and citing to Commission precedents that applied the three-factor test that she now seeks to challenge. The Secretary did, at times, speak as if the NLRB's four-factor test applied. She stated the NLRB test at one point, citing to case law quoting the language in *Advance Specialty Co.* that described this test. J.A. 719. Additionally, in her discussion of the facts, the Secretary used four headings consistent with the four NLRB factors, advancing, by implication, the fourth prong as "centralized control of employment relations/safety and health." J.A. 746. But this was not, in our view, enough to present to the Commission the Secretary's current argument to us that the four-pronged test should be applied and the Commission's three-part test abandoned. *See D.A. Collins Const. Co.*, 117 F.3d at 694-95.

---

[7] The Commission has stated that it adopted the single employer "concept" from the NLRB. *C.T. Taylor Co.*, 2003 WL 1961272, at *3. That is, of course, different from adopting the test itself.

While "it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal," this rule is not absolute. *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). We may exercise our discretion to address such issues when, for example, "we think it necessary to remedy an obvious injustice." *Id.* This is not such a case. The OSH Act confers a limited jurisdictional grant on this court, which counsels that we take extra caution regarding issues not raised before the Commission.[8] *Cf. Modern Cont'l/Obayashi v. OSHRC*, 196 F.3d 274, 283 (1st Cir. 1999). The merits, meanwhile, are not so clear as to raise the specter of an obvious injustice. With little explanation, the Secretary attempts to squeeze the OSH Act's particular concerns regarding workplace safety into a generic test oriented toward labor relations. Moreover, she offers no reason whatsoever for eschewing the Commission's prior consideration of physical worksites.

If the Secretary wishes to alter the Commission's approach to the single employer test, she has many avenues by which to do so. She could challenge the Commission's approach in subsequent cases before ALJs and, ultimately, the Commission. Or she could issue a regulation on the matter. The Secretary, not the Commission, administers the OSH Act; accordingly, as we have said, her interpretations of the Act's text and corresponding regulations will receive our deference even in the face of contrary Commission interpretations. *Chao*, 291 F.3d at 227-28. The existence of these established routes makes us

---

[8] Loretto-Oswego contends that we have no jurisdiction to hear the Secretary's argument given the OSH Act's provisions regarding judicial review. Our decision not to reach this issue does not rest on this jurisdictional ground. The Act provides that, when "persons adversely affected or aggrieved" by an OSHA ruling seek judicial review, "[n]o objection that has not been urged before the Commission shall be considered by the court" absent "extraordinary circumstances." 29 U.S.C. 660(a). Its parallel provision regarding petitions for review filed by the Secretary, however, does not contain such an express limitation. *See* 29 U.S.C. 660(b).

all the more reluctant to permit the Secretary to circumvent them by raising a new issue at this latest stage of the litigation.

## II.

In light of the Secretary's forfeiture, we review the Commission's decision under its prior precedents applying the single employer test. The Secretary raises two challenges to the Commission's application of its test. First, she contends that the Commission erred as a matter of law by overemphasizing Loretto-Oswego's day-to-day control over administrative and safety matters and by underemphasizing evidence of LMC's centralized control over these issues. Second, she claims that the single employer holding was not supported by substantial evidence.

The Commission's single employer inquiry turns on whether the entities in question "handled safety matters as one company." *C.T. Taylor Co.*, 2003 WL 1961272, at *4. It is not clear, under existing case law, whether all three of the Commission's factors must be met in order to find that several entities did handle safety matters as one company. *See id.;* *Vergona Crane Co.*, 1992 WL 184539, at *1-2; *Advance Specialty Co., Inc.*, 1976 WL 22254, at *3-4. As the parties have not argued this question, however, we—like the Commission— will consider the three factors together.

## A.

In challenging the Commission's legal analysis, the Secretary invokes case law applying the four-factor NLRB test—specifically, case law describing that test's inquiry into centralized control of labor relations. Several courts have held that "variances in local management decisions will not defeat the 'single employer' principle." *Sakrete of N. Cal., Inc. v. NLRB*, 332 F.2d 902, 907 (9th Cir. 1964); *see also NLRB v. Carson Cable TV*, 795 F.2d 879,

17

883-84 (9th Cir. 1986) (holding "day-to-day control of labor relations" by local managers insufficient to defeat finding a single employer); *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 26 (1st Cir. 1983) (same). The Secretary contends that this logic should apply under the OSH Act, and that, therefore, the Commission should have looked "beyond formalistic separation" to measures of "centralized control of key policy matters." Pet'r's Br. at 45.

Once again, the Secretary contends that her interpretation of the term "employer" in the OSH Act is entitled to deference. As the Secretary acknowledges, however, she advances this construction as a litigating position, and thus it is entitled to deference only to the extent it has "the power to persuade." *Chao*, 291 F.3d at 228 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)).

The Secretary's argument is not without persuasive power. At the least, it comports with the thrust of our single employer case law under the NLRA: "the policy underlying the single employer doctrine," we have held, "is the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship." *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996). Day-to-day decisions by local managers may suggest independence, but they also may reflect the exercise of authority overseen, to varying degrees, by other entities. Similar logic could, presumably, apply to the single employer inquiry under the OSH Act, even if that inquiry does not look to "centralized control of labor relations" or, as perhaps would be more appropriate, to centralized control of employee *safety*. Without refashioning the Commission's single employer test, this set of considerations could, presumably, come into play in assessing the integration of operations between two entities nominally at arm's length.

18

We do not, however, reach these questions regarding the content of the single employer test under the OSH Act. For, accepting arguendo the Secretary's legal argument about centralized control, we nevertheless see no legal error in the Commission's weighing of the evidence.

Specifically, the Commission did not hold—as the Secretary claims it did—that LMC and Loretto-Oswego could only qualify as a single employer if LMC exercised day-to-day control over Loretto-Oswego's affairs. Nor, in our view, did the Commission emphasize day-to-day control or de-emphasize centralized control to an extent suggesting an error of law under the Secretary's reasoning. It is true that, in the course of its analysis on the integration of operations, the Commission observed: "The record shows that on a day-to-day basis, administrative personnel at Loretto-Oswego operated independently of LMC." *Loretto-Oswego II*, at *3. This statement, however, was part of a larger inquiry into whether the record established "that the affiliates and LMC 'handled safety matters as one company,'" *id.* (quoting *C.T. Taylor Co.*, 2003 WL 1961272, at *4). To address this question, the Commission surveyed a range of indicators regarding both the extent to which LMC could influence Loretto-Oswego on various matters and the extent to which LMC actually did so. While the Commission held that LMC had the power to exercise control over Loretto-Oswego, it concluded that Loretto-Oswego personnel, not LMC employees, "were primarily responsible for safety matters at the facility," *id.* at *4. And it did not limit this finding to day-to-day control.

Of course, the Commission might, like the ALJ, have weighed the evidence differently. We cannot say, however, that it failed to look "beyond a formalistic separation" between centralized and localized control, as the Secretary asserts. Instead, it applied a

19

context-specific analysis attuned to both the extent of potential control and the exercise of actual control. Whether its conclusions following this analysis were supported by substantial evidence remains a separate matter.

**B.**

This brings us to the Secretary's challenge to the Commission's weighing of the evidence. A legal conclusion will be upheld under the substantial evidence standard so long as "a reasonable mind might accept" the evidence in question as "adequate to support" it. *NLRB v. Starbucks Corp.*, 679 F.3d 70, 77 (2d Cir. 2012); *see also D.A. Collins Const. Co.*, 117 F.3d at 694 n.4 (holding that the substantial evidence standard under the OSH Act bears the same meaning as it does under the NLRA as amended by the Taft-Hartley Act).

Not surprisingly, the Secretary focuses on evidence regarding interrelation of operations, and points to the various ways in which LMC oversaw the affiliates. There is no dispute as to the facts underlying the Commission's analysis of the remaining two prongs of its single employer test. The parties agree that Loretto-Oswego and the other affiliates had a common president, chief executive officer, and chief financial officer. And the Secretary does not contest that Loretto-Oswego and the other entities did not operate at a common location. As we consider the three prongs of the Commission's test in concert, we express no opinion as to what these facts might suggest were these two prongs viewed in isolation. The question on appeal is not whether one or another prong has been met, in some legal sense, but rather whether the facts relevant to all three prongs dictate the legal conclusion that the entities operated as a single employer.

As to the remaining prong, the evidence suggests at least an interrelation of a significant sort among the entities in question. Thus, it is no small detail that, prior to the

20

OSHA inspection in question, LMC had hired a corporate safety officer and had begun work on a corporate safety policy applicable to its affiliates. It is significant, as well, that LMC personnel authorized affiliate budgets, conducted trainings and inspections at affiliate facilities, completed performance evaluations of affiliate administrators, instructed affiliate employees on administrative matters, assisted at Loretto-Oswego during the OSHA inspection in question, and so on. Indeed, this evidence might well show a sufficient degree of interrelation to suggest that these entities did not operate at arm's length, at least in the general sense described in our NLRA case law. *See Murray*, 74 F.3d at 405.

But we must ask ourselves whether this evidence of interrelation, in light of the facts relevant to the other two prongs, suggests that Loretto-Oswego and the other entities handled safety matters as a single entity. The record suggests that, at the time of Loretto-Oswego's inspection, LMC dictated only one aspect of the facility's safety policy, regarding bloodborne pathogen exposure. Loretto-Oswego, meanwhile, maintained a safety committee empowered to make the facility's own employee safety policy. It is surely relevant that Loretto-Oswego, in making its safety decisions, adopted targeted safety policies apparently employed by other Loretto affiliates, and that, in responding to the OSHA inspection, Loretto-Oswego sought assistance from LMC. Yet these decisions only gesture at concerted action on employee safety by Loretto-Oswego, on the one hand, and LMC, Loretto-Rest, or Loretto-Utica on the other. The record, meanwhile, provides few examples of instances in which LMC or the affiliates directed Loretto-Oswego policy on other matters.

Under Commission case law, the Secretary bears the burden of showing that multiple entities operated as a single employer. *Loretto-Oswego II*, 2011 WL 95330, at *5 n.4. Viewing

all the evidence in concert, we conclude that the Commission precedents invoked by the Secretary, namely *C.T. Taylor Co.*, *Vergona Crane Co.*, and *Advance Specialty Co.,* in which the Commission found a single employer relationship, do not govern. In those cases, the entities in question had the same upper level management, as in this case. But there was more—in each case, one entity exercised actual control over the other on employee safety matters and the entities shared a common physical workplace. Moving beyond these precedents, the Commission could have found that the Secretary met its burden. On these facts and under its prior case law, however, the Commission did not act unreasonably in not so finding.

## III.

Finally, the Secretary argues that the Commission departed from the ALJ's factual findings and failed to give a reasoned explanation for doing so. She highlights the ALJ's statement: "I do not credit employee testimony to the effect that Loretto facilities operate as separate, independent entities and that administrators at individual facilities are free to disregard Loretto policies and the 'advice and counsel' of Loretto management because it is unpersuasive in view of the record as a whole." *Loretto-Oswego I*, slip op. at 20. She also points, more broadly, to the ALJ's conclusion that LMC and the affiliates had interrelated operations. In the Secretary's view, the Commission accepted the discredited employee testimony and set aside these factual findings without explanation.

As the Secretary argues, other circuit courts have held that when the Commission "reverses the factual findings of the [judge] who had the unique opportunity of observing the demeanor of the witnesses and accepting or rejecting their testimony based on those observations," it "must articulate reasons for its failure to credit those findings." *Brock v. L.E. Myers Co., High Voltage Div.*, 818 F.2d 1270, 1277 (6th Cir. 1987). Our court has applied this

22

logic in relation to a ruling by the Federal Trade Commission ("FTC"). *See ITT Cont'l Baking Co. v. FTC*, 532 F.2d 207, 219-20 (2d Cir. 1976). In *ITT Cont'l Baking Co.*, however, we upheld the FTC's reversal of an ALJ decision even though the FTC did not expressly discuss a contrary ALJ finding. The FTC explained its contrary conclusion in light of the weight of the evidence, we explained, and the unmentioned factual finding amounted only to a "conclusory statement." *Id.* at 220.

Here, the Secretary conflates factual findings and legal conclusions. The Commission did not disturb the factual findings underlying the ALJ's legal analysis. Instead, it weighed the evidence differently, and focused on the absence of evidence that LMC or other Loretto affiliates exercised control over Loretto-Oswego's safety policy at the time of the OSHA inspection. In reaching this conclusion, the Commission did not need to credit the employee testimony regarding advice and counsel, nor did it purport to do so. As to the other evidence of interrelation, the Commission acknowledged its presence but found it insufficient as a matter of law to support a single employer finding. Accordingly, we find no error in the Commission's treatment of the ALJ's factual findings.

## CONCLUSION

We conclude that the Commission's ruling must be upheld. In reaching this conclusion we have applied the Commission's existing standards under the single employer test, and we have expressed no opinion as to the proper legal content of those standards. We note once more the numerous avenues available to the Secretary for seeking to modify the content of that test should she deem that appropriate.

The Secretary's petition for review is DENIED.