[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11327

_____

UHS OF DELAWARE, INC.,
PREMIER HEALTH SOLUTIONS OF FLORIDA,
d.b.a. Suncoast Behavioral Health Center,

Petitioners,

*versus*

SECRETARY OF LABOR,

Respondent.

_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission
Agency No. 18-0731

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

HULL, Circuit Judge:

The Petitioners are (1) Premier Health Solutions of Florida d/b/a Suncoast Behavioral Health Center ("Suncoast"), and (2) UHS of Delaware, Inc. ("UHS-DE"), which manages the Suncoast hospital. The Secretary of Labor cited both Suncoast and UHS-DE for a violation of the Occupational Safety and Health Act's ("OSH Act") General Duty Clause, 29 U.S.C. § 654(a)(1), by failing to protect employees from the known hazard of patient-on-staff workplace violence. Suncoast and UHS-DE petition us for review of the administrative decision affirming the citation.

Petitioners argue that the Occupational Safety and Health Review Commission (the "Commission") erred (1) in concluding that UHS-DE and Suncoast are a "single employer" for liability purposes, and (2) by failing to require the Secretary of Labor to prove that the proposed abatement measures were effective and economically feasible. After review, and with the benefit of oral argument, we grant in part and deny in part the petition for review.

## I. BACKGROUND

### A.    Suncoast Hospital

Suncoast is a 60-bed in-patient psychiatric hospital in Florida. The Suncoast hospital has three units, two for adults and one for children. Most of its patients are involuntarily committed and

experience depression and suicidal ideation. As discussed later, there is patient aggression and violence against hospital staff members.

On average, the Suncoast hospital admits between 200 and 250 patients each month, with each patient staying about five days. In 2018, the hospital averaged about 37 patients at a time. To treat patients, the hospital employs psychotherapists, mental health counselors, recreational therapists, registered nurses, and mental health technicians.

## B.    Relationship between Suncoast and UHS-DE

A third company, United Health Services, Inc. ("UHS, Inc."), is the owner and parent company of both Suncoast and UHS-DE. Specifically, Suncoast is a wholly-owned subsidiary of Premier Behavioral Solutions, Inc., which in turn is a wholly-owned subsidiary of Psychiatric Solutions, Inc., which is a wholly-owned subsidiary of UHS, Inc. UHS-DE provides hospital management services to all of UHS, Inc.'s health centers, including Suncoast.

UHS-DE oversees much of Suncoast's operations through the hospital's "C-suite" leadership, such as the chief executive officer ("CEO"), chief financial officer ("CFO"), and chief operating officer ("COO"). Undisputedly, Suncoast's "C-suite" leadership included CEO Brandy Hamilton, CFO Linda Weymouth, COO-in-training Amrita Nambiar, and Director of Nursing Rochell Phillips. While this leadership team worked on-site at the Suncoast in-patient hospital, its members were employed by UHS-DE.

4                    Opinion of the Court                    23-11327

## C.    OSHA Investigation of Suncoast and Citation

In 2015, a little over a year after the Suncoast hospital opened, Occupational Safety and Health Administration ("OSHA") Compliance Safety and Health Officer Lizbeth Troche first inspected the hospital and, in 2016, issued a hazard letter in reference to workplace violence at the hospital.

In 2017, OSHA received a non-formal complaint alleging workplace violence after a youth patient dove into the nurse's station and stabbed a nurse.  OSHA opened another investigation into the hospital.  OSHA then notified Suncoast of the complaint and open investigation.

As part of the investigation, OSHA Compliance Officer Troche visited the hospital, spoke with management, interviewed employees, and obtained employee accident reports and documents relating to the hospital's workplace violence policies and training materials.  The investigation revealed dozens of instances of patient-on-staff aggression and violence.

OSHA's Troche also asked Adam Curl, Suncoast's Director of Risk, and the hospital's CEO, Brandy Hamilton, a UHS-DE employee, about Suncoast's relationship with UHS.  Troche recalled that Curl explained that Suncoast was a "franchise of UHS[, Inc.]," while Hamilton replied that Suncoast was a "subsidiary of UHS" and that members of "upper management at Suncoast [were] direct employees of UHS[-DE]."

In April 2018, following the investigation, OSHA cited Suncoast and UHS-DE for exposing employees to workplace

23-11327                Opinion of the Court                5

violence in violation of the General Duty Clause, 29 U.S.C. § 654(a)(1).    The amended citation listed several proposed abatement measures.    As amended, the citation alleged that, "[a]mong other methods, feasible and acceptable means of abatement" included:

1. Develop a written workplace violence prevention program incorporating a worksite-specific hazard analysis and employee participation;

2. Reconfigure nurses' workstations to prevent patient access and secure items such as staplers and scissors so they cannot be used as weapons;

3. Designate specific staff with specialized training in security to monitor patients for potential aggression and assist in preventing and responding to violent events;

4. Designate an additional staff member with specialized training in security to be available at intake on all shifts;

5. Revise intake procedures to ensure that specific information about a new patient's history of violence is transmitted to all staff and that they have time to review the information;

6. Create a law enforcement liaison position to develop relationships and agreements with law enforcement entities who regularly bring patients to the hospital;

7. Provide comprehensive training to all employees who encounter patients, including when and how to call for

assistance, uniform and effective methods for responding to workplace violence, and hands-on exercises and practice drills; and

8. Conduct an investigation and debriefing after each act of workplace violence with the attacked and/or injured employee and other involved employees, including root cause or similar analysis, lessons learned, and corrective actions to prevent reoccurrence.

UHS-DE and Suncoast contested the citation and proceeded to a trial before an administrative law judge ("ALJ").

## D.    Administrative Trial

At a twelve-day trial, the parties did not dispute that: (1) the hazard of workplace violence was present, (2) employees were exposed to the hazard, and (3) UHS-DE and Suncoast recognized the hazard.  Instead, the issues of fact to be tried were, *inter alia*: (1) whether the hospital's existing policies and procedures were sufficient to address the hazard, and (2) whether any or all of the proposed abatement measures were a feasible means to eliminate or materially reduce the hazard.

Regarding the adequacy of the hospital's existing methods to mitigate patient-on-staff aggression, the ALJ heard evidence that the hospital's methods at times included: (1) searching patients for potential weapons; (2) locking doors; (3) restricting aggressive patients to their units; (4) reporting acts of patient aggression during shifts; (5) adding staff when the acuity level is high; (6) identifying during intake patients who pose a high risk of

aggression; (7) creating personal safety plans for each new patient; (8) checking on patients every 15 minutes; (9) assigning aggressive patients to one-on-one observation; (10) analyzing incident trends and reviewing incidents of aggression with hospital management; and (11) training staff when hired and annually on verbal de-escalation and physical restraint of aggressive patients and responding to workplace violence.

Despite Suncoast's existing methods, the evidence revealed 54 documented instances of patient-on-staff violence resulting in injuries to staff between January 2016 and July 2018. The violent incidents involved employees being spit at, slapped, bitten, hit, kicked, and punched in the head, among other things. Employees also suffered injuries such as stab wounds, concussions, broken bones, strained backs, bite wounds, dislocated shoulders, a broken hip, bruises, and contusions.

The Secretary presented testimony from experts Dr. Jane Lipscomb, R.N., Ph.D., and Howard Forman, M.D., in support of the eight proposed abatement measures that the Secretary believed would eliminate or materially reduce the hazard. This appeal focuses on the third and fourth abatement measures, which relate to (3) designating "specific staff" with specialized security training and (4) designating "additional staff" with specialized security training. These measures would require Suncoast to hire additional and specialized security personnel to monitor for patient aggression at intake and in all units during all shifts and to respond as needed to such incidents.

In this regard, Dr. Lipscomb was asked directly if she had considered the economic costs of implementing these staffing measures, and Dr. Lipscomb responded, "No, I did not." Dr. Lipscomb also acknowledged that at least one study suggested that hiring security staff merely transferred the risk of injury to the security staff. Dr. Forman did not explicitly address the economic feasibility of these two security staffing measures.

### E.    ALJ's Decision

After trial, the ALJ affirmed the citation against Suncoast and UHS-DE, recharacterizing the violation from "repeat" to "serious," and assessed a $12,934 penalty. First, the ALJ found that Suncoast and UHS-DE's approach to addressing the recognized hazard was inadequate and considered the feasibility of all eight proposed abatement measures.

Second, the ALJ concluded that the Secretary proved that each proposed abatement measure, including the third and fourth security staffing measures, would reduce the hazard. Specifically regarding the third and fourth security staffing measures, the ALJ found that (1) Suncoast and UHS-DE "d[id] not contest the feasibility of these abatement steps" and (2) the Secretary established that these measures were feasible and effective.

Third, the ALJ determined that Suncoast and UHS-DE operated as a single employer and, alternatively, that they were independently liable for exposing directly-employed workers to the hazard.

23-11327                Opinion of the Court                9

## F.    Commission's Decision

Suncoast and UHS-DE petitioned the Commission for discretionary review of the ALJ's decision. In an order, the Commission "directed [the decision] for review" and instructed the parties to brief two issues: whether the ALJ erred (1) in its single-employer ruling, and (2) in concluding that the third and fourth proposed abatement measures were economically feasible.

After the briefing, the Commission in a 14-page order concluded that because the feasibility and efficacy of the other six proposed abatement measures were undisputed, the Secretary met his burden to "prove that at least one of the measures he proposed was not implemented and that the same measure is both effective and feasible in addressing the alleged hazard." The Commission did not address whether the evidence supported the ALJ's determination that the third and fourth staffing-related measures were economically feasible. After a thorough analysis, the Commission also determined that Suncoast and UHS-DE operated as a single employer. Because the Commission concluded that Suncoast and UHS-DE operated as a single employer, the Commission declined to address whether the ALJ correctly held UHS-DE independently liable.

In a concurring opinion, one Commissioner explained that she agreed that the Commission was not compelled to address the economic feasibility and effectiveness of the third and fourth security staffing measures given the undisputed six abatement measures. But, in her view, the Commission should have exercised

its discretion to reach the economic feasibility issue because: (1) proving economic feasibility is a critical part of the Secretary's prima facie case, (2) the Secretary had not proven that the third and fourth security staffing measures were economically feasible, and (3) this presented a recurring issue before the Commission. Highlighting the costs, this Commissioner pointed out that those two measures would require Suncoast to hire staff to fill six 8-hour shifts for every 24-hour period, and the abatement measures dictate that these staff members "not be given other assignments such as patient rounds, which would prevent the person from immediately responding to an alarm or other notification of a violent incident."

Suncoast and UHS-DE timely petitioned for review.

## II. STANDARDS OF REVIEW

In reviewing administrative decisions affirming citations under the OSH Act, we "will set aside an order of the Commission only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *C&W Facility Servs., Inc. v. Sec'y of Lab.*, 22 F.4th 1284, 1287 (11th Cir. 2022). We accept the Commission's findings of fact as conclusive if they are supported by substantial evidence on the record considered as a whole. *Fluor Daniel v. OSHRC*, 295 F.3d 1232, 1236 (11th Cir. 2002) (citing 29 U.S.C. § 660(a)). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *J.A.M. Builders, Inc. v. Herman*, 233 F.3d 1350, 1352 (11th Cir. 2000).

### III. DISCUSSION

On appeal, UHS-DE and Suncoast challenge the Commission's single-employer ruling and the abatement measures ruling. We address each argument in turn.

### A.    UHS-DE and Suncoast Operated as a Single Employer

The OSH Act defines "employer" in relevant part as "a person engaged in a business affecting commerce who has employees." 29 U.S.C. § 652(5). A "person" includes "one or more . . . corporations . . . or any organized group of persons." *Id.* § 652(4).

To determine whether to treat two companies as a single employer, the Commission considers whether the entities "share a common worksite, are interrelated and integrated with respect to operations and safety and health matters, and share a common president, management, supervision, or ownership."[1] *Sec'y of Lab. v. S. Scrap Materials Co., Inc.*, 23 O.S.H. Cas. (BNA) 1596, 2011 WL 4634275, at *34 (No. 94-3393, 2011). The Secretary bears the burden of establishing that the entities are part of a single-employer relationship. *Sec'y of Lab. v. Loretto-Oswego Residential Health Care*

---

[1] Neither UHS-DE nor Suncoast challenges OSHA's authority to promulgate this test under the General Duty Clause, 29 U.S.C. § 654(a)(1). *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Further, they do not dispute the elements of the test, as articulated by OSHA in *Sec'y of Lab. v. S. Scrap Materials Co., Inc.*, 23 O.S.H. Cas. (BNA) 1596, 2011 WL 4634275, at *34 (No. 94-3393, 2011). So we do not consider the issue.

*Facility*, 23 O.S.H. Cas. (BNA) 1356, 2011 WL 95330, at *2 n.4 (Nos. 02-1164, 02-1174, 2011), *aff'd*, 692 F.3d 65 (2d Cir. 2012).

Here, the record amply supports the Commission's determination of a common worksite. Both entities have employees working at a common worksite, the Suncoast hospital. The CEO of Suncoast, Hamilton, is a UHS-DE employee who works full time in the hospital. At the time of OSHA's inspection, CFO Linda Weymouth and COO-in-training Nambiar also worked full time in the hospital and were UHS-DE employees. CEO Hamilton and COO-in-training Nambiar were in the patient units regularly and thus exposed to the hazard of patient-on-staff aggression, regardless of whether they experienced that aggression personally. Suncoast's Director of Nursing Phillips also was a UHS-DE employee who worked in the hospital. Several of these UHS-DE employees had offices in the hospital and were integrally involved in the hospital's daily operations. *See Sec'y of Lab. v. Altor, Inc.*, 23 O.S.H. Cas. (BNA) 1458, 2011 WL 1682629, at *5 (No. 99-0958, 2011) (finding companies shared a common worksite where one company provided supervision while the other company provided labor).

Regarding UHS-DE employees' exposure to the hazard of patient-on-staff aggression, CEO Hamilton testified that she told employees "that my door is open, and that they will see me often, that I'm on the units, and that I will talk to patients." CEO Hamilton also said that she visited the patient units. Moreover, Director of Nursing Phillips testified that leadership members on

23-11327                Opinion of the Court                13

the hospital's Patient Safety Council, including CEO Hamilton and Phillips, would "physically go on to each unit" to "make sure the units are safe." The evidence establishes that both UHS-DE and Suncoast employees shared a common worksite, were on the patient units where the hazard was, and thus were exposed to the hazard of workplace violence.[2]

The record also supports the Commission's finding that the operations of UHS-DE and Suncoast were interrelated and integrated, particularly with respect to health and safety matters. The Secretary established that UHS-DE developed most of Suncoast's safety training and workplace violence policies. For example, UHS-DE provided Suncoast with numerous policies, procedures, and training materials including its code of conduct, Workplace Violence Policy Manual, Preventing Workplace Violence PowerPoint, Risk Management Worksheet, Employee Accident Forms, and Verbal De-Escalation Program. *See A.C. Castle Constr. Co., Inc. v. Acosta*, 882 F.3d 34, 43 (1st Cir. 2018) (concluding that entities had interrelated operations where one company

---

[2] Petitioners contend that two companies cannot have a common worksite without mutual access to a shared hazard, citing *Advance Specialty Co.*, 3 O.S.H. Cas. (BNA) 2072, 1976 WL 22254, at *4 (No. 2279, 1976). But as the Third Circuit pointed out, the *Advance Specialty* decision "held only that mutual access may be sufficient to establish a common worksite." *UHS of Westwood Pembroke, Inc. v. OSHRC*, No. 22-1845, 2023 WL 3243988, at *1 (3d Cir. 2023). In any event, here the Commission determined that "at least one UHS-DE employee—the CEO—" had mutual access with the Suncoast employees to a shared hazard.

instructed the other to follow safety policies that it provided).  A "UHS" logo appeared on many of these safety training materials.

UHS-DE argues that it is more like a third-party safety consultant that provides templates that its client is free to change. In doing so, it relies heavily on the Second Circuit's decision in *Loretto-Oswego*.  There, the Commission found that a nursing home was a separate employer from its management company, and the Second Circuit agreed.  692 F.3d at 67, 72-73, 79.  In doing so, the Second Circuit specifically considered the lack of evidence that the management company addressed employee safety matters in its interactions with the nursing home and handled safety matters as a single entity, namely that the management company dictated only the nursing home's policy regarding bloodborne pathogen exposure. *Id.* at 73, 78.

This case is not like *Loretto-Oswego*.  Here, as the ALJ found, the evidence reflected that in practice, no substantive changes were made by Suncoast to UHS-DE's safety policies and trainings, in part because any proposed changes from Suncoast would need to obtain approval from Suncoast's governing board.  That governing board included several UHS-DE employees, including a UHS-DE Regional Vice President who did not work on-site at the hospital. Moreover, UHS-DE employees like CEO Hamilton and the Director of Nursing participated in (1) Suncoast's Patient Safety Council, which met monthly to discuss patient safety issues in the hospital, and (2) its Environment of Care Committee, which met

quarterly to discuss "everything environmental through the hospital from a safety standpoint."

Finally, the record supports the Commission's finding that Suncoast and UHS-DE shared a common president, management, supervision, or ownership. Besides the fact that UHS-DE and Suncoast shared an ultimate parent company (UHS, Inc.), the hospital was managed and supervised daily by a team of UHS-DE employees, specifically the CEO, CFO, COO-in-training, and Director of Nursing. CEO Hamilton also reported upwards to a UHS-DE regional vice president. Accordingly, the record supports the Commission's finding of a common worksite, integrated safety operations, and common management and its determination that UHS-DE and Suncoast operated as a single employer under the OSH Act.[3]

## B.    The Six Undisputed Abatement Measures Not at Issue

The General Duty Clause provides that each employer "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). OSHA may issue citations

---

[3] For completeness, the record evidence in this case as to the single-employer issue is similar and even stronger than in the Third Circuit's decision in *Westwood Pembroke*, which affirmed the Commission's single-employer ruling. *See Westwood Pembroke*, 2023 WL 3243988, at *1-2. To be clear, though, because the Third Circuit decision is not published, we rely on our own analysis.

under the General Duty Clause only where it has not promulgated a regulation governing a particular hazard at the employer's worksite. *See Active Oil Serv., Inc.*, 21 O.S.H. Cas. (BNA) 1184, 2005 WL 3934873, at *2 (No. 00-0553, 2005) ("It is well established that section 5(a)(1) cannot apply if a standard specifically addresses the hazard cited."). In other words, the General Duty Clause is regarded as "an enforcement tool of last resort." *Reich v. Arcadian Corp.*, 110 F.3d 1192, 1199 (5th Cir. 1997); *see also Reich v. Mont. Sulphur & Chem. Co.*, 32 F.3d 440, 445 (9th Cir. 1994) ("The general duty clause applies when there are no specific standards.").

To prove a violation of the General Duty Clause, the Secretary must establish that: (1) a condition or activity in the workplace presented a hazard; (2) the employer or its industry recognized the hazard; (3) the hazard was causing or likely to cause death or serious physical harm; and (4) a feasible and effective means existed to eliminate or materially reduce the hazard. *See Ga. Elec. Co. v. Marshall*, 595 F.2d 309, 320-22 (5th Cir. 1979)[4]; 29 U.S.C. § 654(a)(1).

The Secretary carries the burden to establish that (1) feasible means existed to eliminate or materially reduce the hazard and (2) the proposed abatement is both economically feasible and "technologically capable of being done." *Beverly Enters., Inc.*, 19 O.S.H. Cas. (BNA) 1161, 2000 WL 34012177, at *34 (Nos.

---

[4] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

91-3144, 92-238, 92-819, 92-1257, 93-724, 2000).    When the Secretary proposes several alternative measures to abate the hazard, he "need only prove that at least *one* of the measures he proposed was not implemented and that the same measure is both effective and feasible in addressing the alleged hazard." *Sec'y of Lab. v. UHS of Westwood Pembroke, Inc.*, 2022 O.S.H. Cas. (BNA), 2022 WL 774272, at *8 (No. 17-0737, 2022) (emphasis added).

Suncoast and UHS-DE do not dispute that a hazard existed, that they recognized the hazard existed, and that the hazard was likely to cause death or serious physical harm.    Suncoast and UHS-DE also do not challenge six of the eight proposed abatement measures.    Rather, they specifically challenge only the third and fourth abatement security staffing measures on the basis that the Secretary failed to prove that those two measures were effective and economically feasible.

We agree with Suncoast and UHS-DE that the record is devoid of any evidence from the Secretary or his expert witnesses that Suncoast hiring round-the-clock security staff would be economically feasible.    Indeed, at trial, the Secretary's expert witness Dr. Lipscomb acknowledged that she had not considered the economic costs of adding these positions.    The Secretary therefore failed to meet its burden as to the third and fourth security staffing-related abatement measures.    Thus, we set aside the ALJ's finding—that these two security-staffing measures were feasible and effective—as arbitrary and capricious.    The Petitioners thus have no duty or obligation to implement these two security

staffing abatement measures.  The Secretary would need to bring and prove a whole new case with a new inspection and a fresh burden of proof.  So as to the third and fourth abatement measures, we grant in part the petition.

Nevertheless, as the Secretary submits, he needed to prove only that at least *one* feasible and effective means existed to eliminate or materially reduce the hazard.  The Secretary established *six* undisputed means of doing so.  Accordingly, the Petitioners identify no basis on which to vacate and remand the Commission's decision affirming the citation, which is supported by the other six proposed abatement measures.

Even as to the six undisputed abatement measures, the Secretary represents that Suncoast and UHS-DE need not adopt *any* of them because an employer "is not required to adopt the abatement method suggested by the Secretary, even one found feasible by the Commission; it may satisfy its duty to comply with the standard by using any feasible method that is appropriate to abate the violation." *Sec'y of Lab. v. Cyprus Mines Corp.*, 11 O.S.H. Cas. (BNA) 1063, 1982 WL 22717, at *4 (No. 76-616, 1982).  The Secretary further advises that UHS-DE and Suncoast are free to develop and implement their abatement methods as long as they meet their obligation to provide employees with a place of employment that is "free from recognized hazards that are causing or are likely to cause death or serious physical harm to [their] employees." 29 U.S.C. § 654(a)(1).  While that may well be true, the fact remains that the third and fourth abatement measures

23-11327            Opinion of the Court            19

were devoid of evidence and should be taken off the table. Petitioners are rightfully concerned that at some point a later Secretary could claim those measures should have been implemented, given the ALJ's explicit findings about them. Petitioners have a valid legal concern, which is why we specifically address the issue and set aside the ALJ's findings as to the third and fourth abatement measures.

Finally, we reject Suncoast and UHS-DE's contention that the General Duty Clause was used to impose regulatory-type requirements because, as we have explained, the Secretary has not required them to take any specific action to abate the hazard.

## IV. CONCLUSION

For the foregoing reasons, we deny in part and grant in part UHS-DE and Suncoast's petition.

**PETITION DENIED IN PART AND GRANTED IN PART.**