**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-13133

_____

HENKELS & MCCOY, INC.,

*Petitioner,*

*versus*

OCCUPATIONAL SAFETY AND HEALTH REVIEW
COMMISSION,
SECRETARY OF LABOR,

*Respondents.*

_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission
Agency No. 18-1864

_____

Before NEWSOM, BRANCH, and LUCK, Circuit Judges.

LUCK, Circuit Judge:

Henkels & McCoy, Inc. performs utility maintenance. After
a deadly workplace accident involving one of its employees and a

digger derrick, the Secretary of Labor (through the Occupational Safety and Health Administration) investigated and cited Henkels for violating the Occupational Safety and Health Act's general duty clause. The Occupational Safety and Health Review Commission found that the secretary had proven a general-duty-clause violation and upheld the citation. Henkels petitioned for our review. We deny the petition because the commission's decision was not arbitrary and capricious and substantial evidence supported the commission's findings.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Henkels performs utility pole maintenance using digger derricks. A digger derrick is about the size of a dump truck, but atop the truck's bed sits a pedestal attaching a captain's chair and hydraulic boom. The boom can be equipped with an auger to drill holes for utility poles, can be used to pull old poles out of the ground, or can be used for general lifting tasks. Eighteen rotation-bearing mounting bolts secure the boom and captain's chair to the pedestal on the truck bed.

### *The accident*

On May 2, 2018, while using an Altec DC47-series digger derrick, one of Henkels's crew leaders was fatally injured. The crew leader and an apprentice were pulling decommissioned utility poles in Jacksonville, Florida. The crew leader was operating the boom from the captain's chair with the apprentice working alongside at ground level. The apprentice heard a "creak," and a bolt sheared off the pedestal. The crew leader stopped work and told

the apprentice to check if the remaining bolts were tight. After he checked, the apprentice told the crew leader that no other bolts were loose and the crew leader resumed working with the boom. The digger derrick began making sounds. Then, the apprentice saw the boom detach from the pedestal and fall, ejecting the crew leader from the captain's chair. The crew leader landed face first on the pavement and later died from his injuries.

### Maintenance practices

The Altec maintenance and parts manual instructs a digger derrick's owner to engage in "special inspection procedures" for the bolts fastening the boom to the pedestal. The manual recommends a visual inspection and an annual torque test. An owner must torque test the bolts with a torque wrench to ensure the bolts are torqued to at least ninety percent of their installation tightness of 325 foot-pounds. Unlike other wrenches, a torque wrench can both tighten and measure the tightness of bolts. Altec placed warning decals in the manual and on the digger derrick's pedestal, which state: "Warning: failure to inspect and properly torque the rotation bearing mounting bolts can cause structural failure. Death or serious injury could result."

Before 2007, Henkels's mechanics performed inspections of the company's digger derricks, including torque testing the bolts. That year, Henkels hired Diversified Inspections/ITL Inc. to provide inspection services. Henkels declined torque testing as part of the 2007 service package because it intended to do those tests itself. But that never happened.

The relationship between Henkels and Diversified began with a handshake agreement. In 2011, Diversified and Henkels entered into a scope-of-work agreement for operations in its west region, which expressly stated, as to the "[r]otation bearing mount bolts," that "[a]t no time will [Diversified] be verifying the torque with a torque wrench. This will be the responsibility of [Henkels]." Later that year, Diversified and Henkels entered into a scope-of-work agreement covering the central region—including Jacksonville. That agreement did not mention torque testing and only said, "[t]he rotation bearing bolts are to be checked for tightness with a wrench" (but not a torque wrench).

Beginning in February 2018, Diversified's inspection reports included a disclaimer that Diversified was not torque testing. Before switching to the new report format, Diversified's representatives met with Henkels and obtained its consent to use the new form with the disclaimer.

On May 1, 2018—the day before the accident—Diversified issued an inspection report with the standard disclaimer for the digger derrick involved in the accident. Although Henkels did not receive this report until after the accident, the same standard disclaimer had been used in earlier reports for some of its other digger derricks. The disclaimer provided: "Diversified Inspections/ITL has checked only accessible bolts for reasonable tightness with the use of an ordinary crescent wrench or open end wrench, but not with a torque wrench nor measuring device of any kind." The disclaimer continued that "[i]t is the customer's responsibility to

torque and maintain all bearing bolts in accordance with the equipment manufacturer's specifications to ensure that all bolts are properly torqued."

*The citation and administrative proceeding*

The secretary investigated the accident and cited Henkels for a serious violation of the general duty clause. The citation alleged that Henkels "exposed employees to struck-by and crushing hazards, in that . . . it did not ensure rotation bearing [bolts] on Altec [d]igger [d]erricks . . . were being properly maintained." And the citation alleged that "[o]ne feasible and acceptable method of abatement would have been to ensure that the [Altec digger derrick] being used had the bearing bolts tested according to [Altec's] maintenance and parts manual."

At the hearing on the citation, the secretary submitted Altec's warning and manual, which called for yearly torque testing, as evidence that Henkels violated the general duty clause. The secretary also called Phillip Toone as an expert witness. Mr. Toone explained that proper torquing "protects the fastener against cyclic or dynamic loading, which can result in fatigue failure." Without testing, there is a risk of the bolts "backing out and falling out." Mr. Toone thus opined that torque testing was necessary and that "you torque to eliminate the hazard and eliminate the possibility of this being a problem." He explained that the bolts on digger derricks "should be torque tested according to the manufacturer's recommendations" because those recommendations "give values and maintenance periodicity to ensure that their designs are safe."

Mr. Toone's report also noted that torque testing had the additional benefit of giving the bolts "an opportunity . . . to fail in a safe and controlled environment."

Henkels submitted its own evidence. First, it pointed to a safety recall for the digger derrick from October 2018. The recall notice explained that the digger derrick had "rotation bearing fasteners that can break. The broken rotation bearing fasteners can possibly cause uncontrolled movement resulting in death or serious injury."

Second, Henkels called Dr. Glen Stevick as an expert witness. Dr. Stevick explained that there was a defect "with the design of this particular bolted connection." Torque testing according to Altec's manual, he explained, would not have revealed the defect. Dr. Stevick reported that the digger derrick's failure "was primarily due to an under-designed (pedestal/ring gear) bolted connection that subjected the . . . [b]olts to excessive cyclic tensile and bending stresses." And based on evidence from Henkels's other digger derricks, he concluded that the bolts "were tight and at specification" and that "[t]here [was] no evidence to support a theory of loose [b]olts." Although Dr. Stevick noted that "[o]ne [b]olt on [another unit] was found to be 10% below specification," he explained that "this slight amount of torque loss would not permit joint separation." Given the design defect, he concluded, torquing lower than Altec's specifications might have been safer for the employees.

*The commission's decision*

Based on the evidence, the commission made four findings. First, the conditions described in the citation—exposure to the risk of being struck or crushed after the digger derrick's boom separates from the pedestal due to improper bolt maintenance—were a hazard under the general duty clause. The commission explained that Altec's manual called for yearly torque testing and credited Mr. Toone's opinion "that failing to torque test the bolts could result in fatigue failure." Second, the hazard was recognized by the industry because the Altec decal "plainly warns that failure to torque the bolts properly can cause a 'structural failure,' resulting in 'death or serious injury.'"

Third, the hazard feasibly and effectively could have been abated by following the manufacturer's instructions, including torque testing. The commission rejected Dr. Stevick's opinions "because they focus[ed] only on whether torque testing would have prevented the incident," and not on whether torque testing would have materially reduced the cited hazard, which was the proper focus under the general duty clause.

Fourth, the commission found that Henkels's violation was a serious one because the company had constructive knowledge that its maintenance practices violated the general duty clause. The commission cited Henkels's communications with Diversified over the years to establish that Henkels knew it needed to torque test the bolts, that it was the company's responsibility to do so, but it failed to test them.

Because the commission found that the secretary had established the elements of a serious general-duty-clause violation, it affirmed the citation and assessed a $12,934 penalty.[1]  Henkels petitions for our review.

## STANDARD OF REVIEW

The commission's decision is due "considerable deference." *Fluor Daniel v. Occupational Safety & Health Rev. Comm'n*, 295 F.3d 1232, 1236 (11th Cir. 2002).  We will set aside the commission's decision "only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *C&W Facility Servs., Inc. v. Sec'y of Lab.*, 22 F.4th 1284, 1287 (11th Cir. 2022); 5 U.S.C. § 706(2)(A).  The commission's findings of fact control when "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion," and must be more than a mere scintilla of evidence.  *C&W*, 22 F.4th at 1287 (quoting *J.A.M. Builders, Inc. v. Herman*, 233 F.3d 1350, 1352 (11th Cir. 2000)).  An agency's decision is arbitrary and capricious when the agency:  (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) offered an explanation "so implausible that it

---

[1] In making its finding, the commission rejected the administrative law judge's conclusion that the secretary had not met his burden to establish a knowing violation of the general duty clause.

could not be ascribed to a difference in view or the product of agency expertise." *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

## DISCUSSION

Under the general duty clause, an employer must "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).  To show a violation, the secretary must prove that:  (1) the employer exposed an employee to a hazard that was likely to cause death or serious physical harm; (2) the employer or the industry recognized the hazard; and (3) there was a feasible and effective way the employer could have abated the risk from the hazard.  *See Ga. Elec. Co. v. Marshall*, 595 F.2d 309, 320–21 (5th Cir. 1979); *see also UHS of Delaware, Inc. v. Sec'y of Lab.*, 140 F.4th 1329, 1338 (11th Cir. 2025).  For a serious violation, as was charged here, the secretary must also show "a substantial probability that death or serious physical harm could result" unless "the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation."  29 U.S.C. § 666(k).

As to each of these elements, Henkels argues that the commission's findings were arbitrary and capricious or not supported by substantial evidence.  We address each element in turn.

*Whether the employer exposed an employee to a hazard that was likely to cause death or serious physical injury*

We start with hazard. Under the general duty clause, the secretary must prove that Henkels exposed an employee to a hazard that was likely to cause death or serious physical harm. *See Ga. Elec. Co.*, 595 F.2d at 320–21.

The secretary's citation described the hazard this way: "On or about May 2, 2018, [Henkels] exposed employees to struck-by and crushing hazards, in that; it did not ensure [bolts] on Altec [d]igger [d]erricks . . . were being properly maintained." The evidence supported the commission's finding that Henkels exposed its employees to this hazard.

Henkels's digger derricks have a large boom, which can lift heavy objects like utility poles. At the citation hearing, the secretary's investigator testified that Henkels's employees had worked with heavy loads using a digger derrick that had improperly maintained bolts. In one example, a Henkels employee was "standing below the crane" of an improperly maintained boom while attaching a cable to a utility pole. Had the bolts failed, the employee "could have been crushed." This was one of "a number of different scenarios" in which Henkels's employees could have been struck or crushed while on the job.

The evidence also supported the commission's finding that this hazard was likely to cause death or serious physical harm. The Altec warning decal, which was in the manual and on the side of the digger derrick pedestal, warned that "failure to inspect and

properly torque the rotation bearing mounting bolts can cause structural failure" and that "death or serious injury could result" from such a failure.

Henkels raises three counterarguments. First, Henkels argues that the definition of "hazard" requires proof of a physical condition, and that failing to properly maintain the bolts is not a physical condition that can be a hazard. But we have not taken such a cramped view of what constitutes a hazard. Instead, "we have . . . equated the phrase 'condition, practice, means, method, operation or process' with 'hazard.'" *Chewy, Inc. v. U.S. Dep't of Lab.*, 69 F.4th 773, 776 (11th Cir. 2023) (citing *Brock v. Williams Enters. of Ga., Inc.*, 832 F.2d 567, 570 (11th Cir. 1987)). Henkels's maintenance practices are a "practice." In any event, the commission defined the hazard as being crushed or struck after the digger derrick's boom detaches when working around equipment that had not been maintained according to the manufacturer's specifications. As defined, being crushed or struck by a boom is a physical condition.

Second, Henkels contends that the secretary impermissibly defined the hazard as the absence of the proposed abatement measure. But this argument fails because it uses the same flawed premise as Henkels's previous argument—that the hazard is the failure to torque test. This misunderstands the ultimate source of the hazard. To be sure, not ensuring bolts "were being properly maintained" was essential to the citation. And maintaining the bolts according to the manufacturer's specification requires torque testing.

But that does not mean the hazard was defined as a lack of torque testing. Rather, including maintenance practices as a component of the definition of the hazard served the goal of emphasizing conditions or practices over which the company had control. *See Davey Tree Expert Co.*, 11 BL OSHC 1898, 1984 WL 34818, at *1 (No. 77–2350, 1984). This emphasis was important because an employer may be fined only for hazards that it can abate. *See Ga. Elec. Co.*, 595 F.2d at 321. While the citation included practices over which Henkels had control as part of the hazard, the defined hazard also had other components. Specifically, the hazard was being struck or crushed after the boom detached from the pedestal. So the hazard was not coextensive with the proposed abatement.

And third, Henkels asserts there is no evidence that the cited hazard caused or was likely to cause death or serious physical harm. Not so. Substantial evidence supported the commission's finding here—the commission credited the Altec warning decal and Mr. Toone's testimony on this point. The Altec warning decal and Mr. Toone's testimony supported the commission's finding that improperly maintaining the digger derrick's bolts could cause the bolts to fail. That exposed employees to the risk of being struck or crushed, which was likely to cause death or serious physical injury.

Henkels counters that the only way an employee could be harmed is if the bolts were loose, and since the evidence suggested the bolts were tight in other Henkels trucks, it was unlikely this was the reason for the accident. But this misses the point. The issue under the general duty clause is whether the company's

practice "exposed" its employees to the hazard. The commission found that Henkels's practice of not torque testing the bolts "exposed" its employees to the risk of serious physical harm or death from being crushed or struck after the boom detaches—whether the hazard ever came to pass or not. The fact that other trucks that Henkels's expert inspected were at some point within the manufacturer's specification does not answer whether Henkels exposed its employees to the risk of death or serious physical harm by not torque testing the bolts.

*Whether the employer or industry recognized the hazard*

Next, under the general duty clause, the secretary must show that the hazard was "recognized," which it can do by showing "the condition is generally known to be hazardous in the industry." *Ga. Elec. Co.*, 595 F.2d at 321 (citation omitted). "Manufacturers' instructions and voluntary industry standards that contain explicit safety warnings regarding compliance may be probative evidence" of industry recognition. *K.E.R. Enters., Inc.*, 23 BL OSHC 2241, 2013 WL 157682, at *3 (No. 08-1225, 2013).

The commission found that the industry recognized the hazard of not properly torquing the bolts, and the evidence supports that finding. The Altec warning label in the manual and on the digger derrick's pedestal included an explicit safety warning: "Warning: failure to inspect and properly torque the rotation bearing mounting bolts can cause structural failure. Death or serious injury could result."

Henkels argues that the warning labels were ineffective because "failure to inspect and properly torque" is a conjunctive requirement, and there was no evidence of improper bolt tightness from improper torquing. So, Henkels argues, the warning is only sufficient to create a recognized hazard when an entity fails both proper inspection and torquing.

But Henkels misreads the phrase "inspect and properly torque." The "and" in that sentence simply means that if either requirement is not met, then the practice is recognized as hazardous. In other words, not properly torquing, not inspecting, or not inspecting and properly torquing are each warned against. *Cf. Pulsifer v. United States*, 601 U.S. 124, 150–51 (2024) (explaining that "conjunctions are versatile words, which can work differently depending on context," including by "join[ing] several individually necessary conditions").

### *Whether there was a feasible and effective way the employer could have abated the risk from the hazard*

Once a recognized hazard is established, under the general duty clause, the secretary must show that "a feasible and effective means existed to eliminate or materially reduce the hazard." *UHS*, 140 F.4th at 1338. The secretary can do this by specifying "the particular steps the employer should have taken to avoid citation, and he must demonstrate the feasibility and likely utility of those measures." *Champlin Petroleum Co. v. Occupational Safety & Health Rev. Comm'n*, 593 F.2d 637, 640 (5th Cir. 1979).

The commission found that Henkels could have avoided the citation by testing the bolts in compliance with Altec's manual. Henkels does not contest that these steps were feasible. *See id.* And substantial evidence supports the commission's finding that following Altec's manual would have materially reduced the hazard.

Mr. Toone testified that bolts "should be torque tested according to the manufacturer's recommendations" because those recommendations "give values and maintenance periodicity to ensure that their designs are safe." He also testified that "[w]hen you reduce the torque . . . then you reduce the value you're going to get before you have separation."

For three reasons, Henkels disagrees. First, it argues that the commission "arbitrarily reject[ed]" the opinion of its expert, Dr. Stevick, that looser bolts may have been better than the manufacturer's recommended tightness. This was error, the company contends, because the commission improperly made its own credibility finding without "defer[ring] to [the administrative law] judge's demeanor-based credibility determination." *See Mansfield Indus., Inc.*, 2020 CCH OHSD ¶ 33829, 2020 WL 8871368, at *4 (No. 17-1214, 2020). But the commission did not make a credibility finding when it rejected Dr. Stevick's testimony. The commission concluded that Dr. Stevick's testimony was not relevant because it focused on how the accident could have been prevented instead of whether the "proposed abatement measures were a feasible means to eliminate or materially reduce the hazard," which is the focus of the general duty clause. *See UHS*, 140 F.4th at 1333–34. So, the

commission dismissed Dr. Stevick's testimony about loose bolts because the testimony was not relevant, and not because it lacked credibility.

Second, Henkels contends that following the manufacturer's instructions would not have been effective at preventing the accident because the accident was caused by a manufacturer's defect. But, again, this improperly focuses on the accident rather than where the focus should be—on the hazard. Under the general duty clause, the question is whether the abatement measure would have materially reduced the likelihood of the hazard, not this specific accident. *See Champlin Petroleum*, 593 F.2d at 642 (explaining that "a citation is supported by evidence which shows the preventability of the [g]eneric hazard, if not this particular instance"). Because Mr. Toone's testimony showed that the likelihood of the hazard would have been abated by following the manufacturer's instructions, substantial evidence supported the commission's abatement finding.

Third, Henkels contends that the secretary's proposed abatement method created a new hazard because it made an accident stemming from the manufacturer's defect more likely to occur. But the fact that Henkels may have to abate a separate and distinct hazard does not mean that the hazard in this case couldn't have been abated by following the manufacturer's instructions. The evidence showed it would have been.

*Whether the violation was a serious one*

Finally, under the general duty clause, a violation is a serious one if the employer knew, or with reasonable diligence could have known, of the presence of the violation. *See* 29 U.S.C. § 666(k). Constructive knowledge is sufficient. *See ComTran Grp., Inc. v. U.S. Dep't of Lab.*, 722 F.3d 1304, 1307–08 (11th Cir. 2013).

The commission found that Henkels had constructive knowledge of the violation because with reasonable diligence it could have discovered the violation. Henkels and its contractor Diversified entered into a scope-of-work agreement for the west region in 2011, which expressly provided that "[a]t no time will [Diversified] be verifying the torque with a torque wrench. This will be the responsibility of [Henkels]." That same year, Diversified and Henkels entered into a scope-of-work agreement that covered the central region, including Jacksonville. The agreement acknowledged that "[t]he rotation bearing bolts are to be checked for tightness with a wrench," but it did not require torque testing. By February 2018, when Diversified began using reports with a disclaimer that it was not torque testing and the responsibility to torque test the bolts rested with the customer—and Henkels approved the disclaimer—Henkels should have known the bolts were not properly tested.

Henkels offers three responses. First, it argues the commission applied the wrong legal standard. According to Henkels, the question is whether Henkels should have discovered the violation, not whether it could have done so. But the commission applied

the right standard. It said that the secretary needed to prove "the employer knew or, with the exercise of reasonable diligence could have known of the hazardous condition." *See Peacock Eng'g Inc.*, 26 BL OSHC 1588, 2017 WL 3864205, at *2 (No. 11-2780, 2017) (citing *Burford's Tree, Inc.*, 22 BL OSHC 1948, 2010 WL 151385, at *2 (No. 07-1899, 2010)). The commission's finding tracked the text of the Occupational Safety and Health Act. *See* 29 U.S.C. § 666(k) (defining a serious violation as one where there is a "substantial probability that death or serious physical harm could result . . . unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation").

Second, Henkels contends that it did not receive a report with a disclaimer for the digger derrick involved in the accident until well after the boom came off the truck. But, for months, Henkels had been receiving reports with the disclaimer that Diversified was not testing the torque of the bolts and it was Henkels's responsibility to test them. Henkels signed off on the disclaimer. At the time of the accident, Henkels knew that Diversified was not torque testing the bolts, and that it was Henkels's responsibility to test them.

Third, Henkels asserts that the commission improperly treated its reasonable reliance argument as an affirmative defense rather than as part of the secretary's prima facie burden to show constructive knowledge. Henkels cites *Sasser Electric & Manufacturing Co.* for the proposition that when a company relies on a third party to comply with workplace standards, the secretary has the

22-13133                Opinion of the Court                19

burden to show that reliance is not reasonable. 11 BL OSHC 2133, 1984 WL 34886, at *3–4 (No. 82–178, 1984). The commission, Henkels contends, erred by classifying this burden as an affirmative defense.

We need not—and do not—decide whether Henkels is right about *Sasser*, because, as our sister circuit has explained, the employer can reasonably rely on a third party to comply with its workplace standards only when the third party has expertise and control that the company lacks. *See Fabi Constr. Co. v. Sec'y of Lab.*, 508 F.3d 1077, 1083 (D.C. Cir. 2007) ("In short, *Sasser* requires reasonable reliance on contractors. Therefore, it does not apply when an employer has reason, by way of expertise, control, and time, to foresee a danger to its employees."). That is not the case here. The record shows Henkels used to perform its own torque tests before contracting with Diversified. As early as 2011, the parties' scope-of-work agreement for the west region was clear that Diversified would not torque test, and that Henkels would perform its own torque testing. The scope-of-work agreement for the central region, including Jacksonville, specified that Diversified would only check for tightness with a regular wrench. The 2018 inspection forms noted Diversified would not torque test and said "[i]t is the customer's responsibility to torque and maintain all bearing bolts in accordance with the equipment manufacturer's specifications to ensure that all bolts are properly torqued."

In short, given its expertise and control, the history of its agreements with Diversified, and the express disclaimer, Henkels

could not have reasonably relied on Diversified to torque test. Henkels had whatever minimal knowledge and experience was necessary to perform torque tests, but it chose not to.

## CONCLUSION

Having determined that the commission's decision was not arbitrary and capricious and that its findings were supported by substantial evidence, we deny Henkels's petition.

**PETITION DENIED.**